## MARINA BORNEMANN *v.* RICHARD BORNEMANN
### (SC 15821)

Callahan, C. J., and Borden, Norcott, Katz and McDonald, Js.

Argued February 20—officially released July 21, 1998

*Lori Welch-Rubin*, with whom was *Jane Grossman*, certified legal intern, for the appellant (defendant).

*William H. Cashman*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The defendant, Richard Bornemann, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Marina Bornemann, awarding joint legal custody of the parties' minor child, ordering a

property distribution pursuant to General Statutes § 46b-81,[1] and awarding rehabilitative alimony and attorney's fees to the plaintiff. The issues to be decided on appeal are whether: (1) the trial court properly determined that certain stock options were available for equitable distribution pursuant to § 46b-81 although the options were not exercisable at the time of dissolution and the defendant's ability eventually to exercise the options on their respective maturity dates was contingent upon his adhering to the terms of an agreement with his former employer; (2) the trial court abused its discretion in awarding those stock options to the plaintiff; (3) the trial court abused its discretion in awarding rehabilitative alimony to the plaintiff; (4) the trial court abused its discretion in awarding attorney's fees to the plaintiff; and (5) the trial court properly awarded items to the defendant that neither party owned but as to which the defendant held a contractual

---

[1] General Statutes § 46b-81 provides: "Assignment of property and transfer of title. (a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court is the proper mode to carry the decree into effect.

"(b) A conveyance made pursuant to the decree shall vest title in the purchaser, and shall bind all persons entitled to life estates and remainder interests in the same manner as a sale ordered by the court pursuant to the provisions of section 52-500. When the decree is recorded on the land records in the town where the real property is situated, it shall effect the transfer of the title of such real property as if it were a deed of the party or parties.

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

right to purchase. Following the trial court's judgment, the defendant appealed to the Appellate Court. We transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The facts that are relevant to this appeal are undisputed. The parties were married on December 17, 1990, when the plaintiff was twenty-two years of age and the defendant was thirty-four years of age. Both parties were college graduates at that time. The parties have one child, Maximillian Marshall Bornemann (Marshall), who was born prematurely on January 25, 1991, and as a result has experienced developmental delays and has special needs. Throughout most of the marriage, the defendant was employed full-time and he has extensive employment experience in the areas of management and lobbying. His most recently held position as a government affairs representative was obtained in July, 1992, and terminated in July, 1995. In that position, he earned approximately $128,000 per year in base compensation and received stock options and bonuses as additional compensation. The plaintiff's employment experience is limited. Prior to the birth of Marshall, the plaintiff briefly was employed full-time, at one point earning an annual salary of $27,000. After Marshall's birth, the plaintiff assumed the role of homemaker and primary caretaker of Marshall. Occasionally, she also worked on a part-time basis as a tennis instructor, tennis club membership recruiter, high school lacrosse coach, and mystery shopper, and volunteered at various charity events.

Approximately three and one-half years into their marriage, the parties separated. A two year pendente lite period followed, during which the parties shared responsibility for Marshall, each caring for him three and one-half days per week. The defendant resided in

Washington, D.C., where his employment was based, from Tuesday through Saturday of every week while the plaintiff, on those days, occupied the family home in Madison with Marshall. From Saturday through Tuesday of every week, the defendant returned to the family home to stay with Marshall, while the plaintiff vacated the family residence and went to reside with a man with whom she had become involved during the marriage. During the pendente lite period, the defendant paid child support to the plaintiff in the amount of $250 per week, pendente lite alimony in the amount of $1070 per month and, in addition, paid all of the other household expenses, including the home mortgage and taxes, home maintenance expenses, credit card debt, and automobile expenses, and maintained health insurance for the family and a life insurance policy on himself.

In July, 1995, the defendant's employer, Kansas City Southern Industries (Southern Industries), decided to terminate the defendant's employment. The defendant and his employer entered into negotiations as to the terms of his termination, and eventually reached an agreement in December, 1995. The agreement was structured so as to preserve for the defendant the opportunity to exercise certain stock options that had been issued to him as part of his initial employment agreement. As part of that initial agreement, the defendant had received options to purchase 30,000 shares of Southern Industries' stock that became exercisable at the rate of 6000 shares per year subject to the condition that the defendant continued to be employed with Southern Industries at the time the options became exercisable. In July, 1995, when negotiations concerning the termination agreement began, only the first two flights of options had become exercisable. The third flight became exercisable in October, 1995, prior to the actual signing of the agreement in December, 1995. The termination agreement provided that the defendant

would remain employed through October 1, 1997, although beginning on January 1, 1997, his salary would be reduced to $1 per year. The agreement also required that the defendant not accept other employment if such employment would conflict with the interests of Southern Industries during the period covered by the agreement, that the defendant refrain from revealing any of Southern Industries' trade secrets, and that the defendant release any and all claims against Southern Industries arising before the date of the agreement. In return, the defendant would continue to be an employee of Southern Industries through October 1, 1997, so that as the fourth and fifth flights of stock options became exercisable, he would be able to exercise them.

As of the date of the dissolution proceedings, the defendant had not yet succeeded in obtaining new employment. The plaintiff admitted that she had not seriously sought employment during the two year pendente lite period. She indicated, however, that she intended to seek full-time employment in the fall of 1997 when Marshall was scheduled to enter a full day program at school.

In dissolving the parties' marriage, the trial court determined that neither party was at fault for the demise of the marriage. Further, it found that while both parties presently were underemployed, only the plaintiff was underemployed as that term is used in the Child Support and Arrearage Guidelines. Regs., Conn. State Agencies § 46b-215a-1 et seq.[2] The court stated that, in setting the amount of child support to be paid by the defendant at $247 per week, it was deviating from the guidelines on the basis of the plaintiff's underemployment and on

[2] Under the Child Support and Arrearage Guidelines, the court may deviate from the guidelines based upon a parent's earning capacity if the court determines that the parent's earning capacity is a financial resource that could be used for the benefit of the child or for meeting the parent's own needs. Regs., Conn. State Agencies § 46b-215a-3 (b) (1) (B).

the basis of the equal access schedule under which the plaintiff and the defendant would have physical custody of Marshall for an equal amount of time each week.[3] The court awarded the family residence, the family automobile, all of the shares of stock in Southern Industries currently owned by the defendant, and one half of the stock options associated with the first four flights of options to the plaintiff. In addition, the court ordered the defendant to pay $400 per week for eighteen months to the plaintiff as rehabilitative alimony, and $16,000 toward the plaintiff's attorney's fees. The court awarded the defendant the remaining fifth flight of stock options, one half of the first four flights of stock options, and the right to purchase the contents of his rented Washington, D.C. residence. Each party was also awarded miscellaneous other assets as shown on their respective financial affidavits, which included small bank accounts, to be retained free of any claim by the other.

I

The defendant first claims that the trial court's distribution of the "unvested" fourth and fifth flights of stock options—options that were not yet exercisable at the time of dissolution—was improper under § 46b-81. Specifically, the defendant argues that the fourth and fifth flights of stock options were intended as compensation for future services to be performed by him after the date of dissolution and, therefore, were not marital assets available for distribution to the plaintiff. The plaintiff disputes the defendant's contention that the stock options were intended as compensation for future services, arguing that they were received as compensation for past services and constituted an asset of the

---

[3] Another basis for deviation from the Child Support and Arrearage Guidelines is a shared custody arrangement where neither parent has primary custody of the minor child or children. Regs., Conn. State Agencies § 46b-215a-3 (b) (6) (A).

marital estate. We conclude that, under the circumstances, the fourth and fifth flights of options properly were distributed as marital property.

Whether the fourth and fifth flights of stock options were properly characterized as marital property available for distribution to the plaintiff under § 46b-81 is a matter of statutory interpretation. Statutory interpretation is a matter of law and, therefore, our review is plenary. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). In interpreting statutes, our analysis is guided by well established principles of statutory construction. In construing statutes, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 663, 680 A.2d 242 (1996).

A

As a preliminary matter, we note that this court has not previously considered whether stock options that have been granted but have not yet become exercisable at the time of a dissolution and can be exercised at a future date only if certain conditions are met by the employee to whom they were granted are a property interest encompassed within the meaning of property under § 46b-81. Neither § 46b-81 nor any other closely related statute defines property or identifies the types of property interests that are subject to equitable distribution in dissolution proceedings. Our prior cases interpreting § 46b-81 indicate, however, that in enacting § 46b-81, the legislature acted to expand the range of

resources subject to the trial court's power of division, and did not intend that property should be given a narrow construction. *Simmons* v. *Simmons*, 244 Conn. 158, 165, 708 A.2d 949 (1998); *Krafick* v. *Krafick*, 234 Conn. 783, 797, 663 A.2d 365 (1995).

We considered the definition of property in *Krafick* in the context of determining whether vested pension benefits represented a type of property interest subject to distribution under § 46b-81. In concluding that the vested pension benefits at issue were property that could be distributed under § 46b-81, we reasoned that a broad definition of property is consistent with the purpose of § 46b-81 of recognizing that "marriage is, among other things, a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute—directly and indirectly, financially and nonfinancially—the fruits of which are distributable at divorce." (Internal quotation marks omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 795. We also acknowledged, however, that our broad definition of property was not entirely without limitation, and that property under § 46b-81 includes only interests that are presently existing, as opposed to mere expectancies. *Rubin* v. *Rubin*, 204 Conn. 224, 230–31, 527 A.2d 1184 (1987). Therefore, we analyzed the contingent nature of the pension benefits at issue in order to determine whether the contingency to which the benefits were subject rendered them a mere expectancy. *Krafick* v. *Krafick*, supra, 797. We concluded that the pension benefits represented a presently existing interest because they created in their holder an enforceable contract right, and such a right represents more than a mere expectancy. Id. "The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy." (Internal quotation marks omitted.) Id.

Employing the same type of an analysis in *Simmons* v. *Simmons*, supra, 244 Conn. 173, we concluded that a medical degree earned by one spouse during a marriage is not property subject to distribution within the meaning of § 46b-81. We found the medical degree at issue to be distinguishable from the unmatured pension benefits at issue in *Krafick* because the medical degree entailed no presently existing, enforceable right to receive income in the future. Id., 167. Instead, the medical degree represented only an opportunity for the degree holder to earn income in the future. Id. In other words, the benefit to be derived from the medical degree represented a mere expectancy interest and, as such, was not distributable under § 46b-81. Id., 170.

Stock options are analogous to pension benefits in that they bestow a right upon the holder to receive a promised benefit under prescribed conditions. 2A Research Institute of America, Benefits Coordinator (1995) pp. 31, 101. Generally speaking, much like the right of a pension beneficiary to collect a pension once the particular conditions under which the pension was offered have been satisfied—typically, the attainment of a prescribed age and the fulfillment of a required number of years of service for the employer—the holder of a stock option possesses the right to accept, under certain conditions and within a prescribed time period, the employer's offer to sell its stock at a predetermined price. Id. Should the employer attempt to withdraw the offer, the employee has a "chose in action" in contract against the employer. See *Ross* v. *Ross*, 90 Md. App. 176, 183, 600 A.2d 891 (1992). Conversely, "[t]he defining characteristic of an expectancy is that its holder has no enforceable right to his beneficence." (Internal quotation marks omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 797.

Despite the fact that the stock options at issue in this case had not yet "matured" or "vested" at the time of

dissolution, the options created an enforceable right in the defendant. The termination agreement that the defendant entered into with his employer, Southern Industries, provided him with the right to remain classified as an employee until October, 1997, under certain conditions, so as to afford him the opportunity to exercise the fourth and fifth flights of stock options that remained unvested at the time of the agreement. Although the defendant's failure to abide by the conditions contained in the agreement would have constituted a breach of the agreement that might have resulted in forfeiture of the stock options, and although the fourth and fifth flights of options were not presently exercisable at the time of dissolution, the defendant's interest in the options amounted to more than a mere expectancy. Certainly, as long as the defendant abided by the terms of the termination agreement—i.e., as long as he did not accept employment that conflicted with the interests of Southern Industries, did not reveal any of Southern Industries' trade secrets during the operative period, and did not bring any claim against Southern Industries for conduct preceding the date of the agreement, or violate any of the other provisions of the agreement—he was entitled to exercise the options on their respective maturity dates, and would have had a cause of action for breach of contract if Southern Industries had refused to allow him to exercise the options. Such a presently existing, contractual interest is an interest in property that is encompassed within the broad definition of property under § 46b-81. Id. Therefore, we conclude that the unvested stock options properly were distributed under that section.

Our conclusion is in accord with the conclusions of several other jurisdictions that have considered whether unvested stock options are property subject to distribution at the time of dissolution. The trend in other jurisdictions has been to treat unvested stock

options as property on the basis that the options create a contractual right in the employee who holds them that is a valuable form of intangible property.[4] Analogously, jurisdictions that have not yet considered whether unmatured stock options are property have decided that similar sources of deferred income, such as pension benefits and trust interests, whether vested or not, constitute property subject to distribution in a dissolution action, provided that the contingent nature of the interest does not render the interest a mere expectancy.[5] In

---

[4] The following jurisdictions have decided that stock options that are not presently exercisable at the time of dissolution constitute marital property subject to equitable distribution: *Richardson* v. *Richardson*, 280 Ark. 498, 659 S.W.2d 510 (1983); *In re Marriage of Hug*, 154 Cal. App. 3d 780, 201 Cal. Rptr. 676 (1984); *In re Marriage of Miller*, 915 P.2d 1314 (Colo. 1996); *In re Marriage of Frederick*, 218 Ill. App. 3d 533, 578 N.E.2d 612 (1991); *In re Marriage of Moody*, 119 Ill. App. 3d 1043, 457 N.E.2d 1023 (1983); *Goodwyne* v. *Goodwyne*, 639 So. 2d 1210 (La. App. 1994); *Green* v. *Green*, 64 Md. App. 122, 494 A.2d 721 (1985); *Lomen* v. *Lomen*, 433 N.W.2d 142 (Minn. App. 1988); *Salstrom* v. *Salstrom*, 404 N.W.2d 848 (Minn. App. 1987); *Smith* v. *Smith*, 682 S.W.2d 834 (Mo. App. 1984); *Pascale* v. *Pascale*, 140 N.J. 582, 660 A.2d 485 (1995); *Callahan* v. *Callahan*, 142 N.J. Super. 323, 361 A.2d 561 (1976); *Garcia* v. *Mayer*, 122 N.M. 57, 920 P.2d 522 (App. 1996); *DeJesus* v. *DeJesus*, 90 N.Y.2d 643, 687 N.E.2d 1319, 665 N.Y.S.2d 36 (1997); *In re Marriage of Powell*, 147 Or. App. 17, 934 P.2d 612 (1997); *Dietz* v. *Dietz*, 17 Va. App. 203, 436 S.E.2d 463 (1993); *In re Marriage of Short*, 125 Wash. 2d 865, 890 P.2d 12 (1995); *Kapfer* v. *Kapfer*, 187 W. Va. 396, 419 S.E.2d 464 (1992); *Chen* v. *Chen*, 142 Wis. 2d 7, 416 N.W.2d 661 (1987); but see *Hann* v. *Hann*, 655 N.E.2d 566 (Ind. App. 1995) (stock options not exercisable at time of dissolution are not marital property); *Hall* v. *Hall*, 88 N.C. App. 297, 363 S.E.2d 189 (1987) (same); *Ettinger* v. *Ettinger*, 637 P.2d 63 (Okla. 1981) (same).

[5] See *Moore* v. *Moore*, 114 N.J. 147, 553 A.2d 20 (1989) (uncertainty of postretirement cost of living increases to pension benefit does not render increases so speculative as to be immune from distribution; instead, uncertainties and contingencies are issues that affect only how and when such benefits should be distributed); *Kruger* v. *Kruger*, 73 N.J. 464, 375 A.2d 659 (1977) (military retirement pay that may be eliminated or reduced by federal government is property subject to distribution even though it may become worthless in future); *Ryan* v. *Ryan*, 261 N.J. Super. 689, 619 A.2d 692 (1992) (severance payment received after date divorce proceedings commenced—date on which estate is determined under relevant statute—was marital property subject to distribution because payment could be characterized as compensation for past labor rather than replacement for future earnings);

our view, the modern trend toward recognizing all forms of presently existing interests as property subject to distribution at the time of dissolution is well considered. The failure to interpret property broadly under § 46b-81 could, and likely would, result in substantial inequity in light of the numerous and varied forms of employment compensation that are in use today. Such a result clearly would be contrary to the purposes of § 46b-81 and would not be in keeping with the equitable nature of dissolution proceedings under that section.

B

The defendant does not disagree with the conclusion that the unvested stock options can represent a property interest subject to distribution under § 46b-81. Instead, he argues that, under the facts of this case, the fourth and fifth flights of options should not have been distributed because they were not entirely *marital* property. Specifically, he contends that the fifth flight of stock options was not a marital asset because he earned it entirely after the date of dissolution, and the fourth flight of stock options was only in part a marital asset, because he earned it in part subsequent to the dissolution. Therefore, he argues, the fifth flight was not available for distribution to the plaintiff, and the fourth flight was only partially available. We are not

*Chilkott* v. *Chilkott*, 158 Vt. 193, 607 A.2d 883 (1992) (husband's remainder interest in irrevocable trust that gave trustee power to invade principal for mother's health, maintenance and welfare, is form of property subject to distribution because it represents future, contingent interest not so remote as to have no ascertainable present value rather than bare hope of succession); compare *Ross* v. *Ross*, 90 Md. App. 176, 600 A.2d 891 (1992) (husband's preemptive right as shareholder to acquire stock owned by other deceased, retiring or terminating shareholders at book value of such shares as of date of corporation's fiscal year end in year that death, retirement or termination occurs in amount proportional to amount of stock already owned in relation to total outstanding shares if two or more shareholders seek to acquire available shares represents mere expectancy interest rather than presently existing property interest).

persuaded that the fourth and fifth flights of options were provided in exchange for services to be performed after the date of dissolution.

Although § 46b-81 (a) employs very broad language in providing for the distribution of property in a dissolution proceeding and grants the court authority to "assign to either the husband or wife all or any part of the estate of the other," this court previously has determined that "[§] 46b-81 (a) involves the assignment of *marital* assets." (Emphasis in original.) *Sunbury* v. *Sunbury*, 216 Conn. 673, 676, 583 A.2d 636 (1990). After the judgment of dissolution in *Sunbury*, the case was remanded for redetermination of the financial orders because the trial court had calculated the defendant husband's income incorrectly. The plaintiff wife appealed the new orders, arguing that the trial court should have valued the parties' assets as of the date of remand, rather than the date of dissolution. In the interim between the date of dissolution and the proceedings on remand, the value of the defendant husband's profit sharing plan had quadrupled. This court held that, under § 46b-81, the date of dissolution is the appropriate date on which to value the parties' assets, and that "[t]o the extent that the plaintiff seeks consideration of a postdecree appreciation in the value of property, such appreciation, having occurred after the termination of the marriage, is no longer a marital asset." Id.

Thus, *Sunbury* requires that in dissolution proceedings, the court must determine whether an asset was earned prior to or subsequent to the date of dissolution in order to determine whether the asset is marital property. This approach is common in other jurisdictions that have considered the extent to which unvested stock options represent marital property, for the reason that state statutes commonly distinguish between assets earned or acquired prior to separation or dissolution

and assets earned or acquired subsequent to separation or dissolution.[6] In determining when unvested stock options were earned, or will be earned, the purpose for which the options were granted must be considered. Stock options may be awarded for a variety of purposes—including to compensate the employee for past or present services, or to provide an incentive for future service—that may or may not relate in whole or in part to the period of the marriage. Decisions from other jurisdictions that have performed such analyses are informative.

In *Pascale* v. *Pascale*, 140 N.J. 583, 660 A.2d 485 (1995), the court considered whether unvested stock options that were awarded to the wife in conjunction with a promotion she received shortly after the date on which she filed for divorce were marital property distributable to her spouse. In New Jersey, the filing date is the date on which the marital estate is fixed. The wife argued that the options were awarded as an incentive for her future service in the new position to which she was promoted. The court determined, however, that the unvested options were awarded as

---

[6] See, e.g., *In re Marriage of Hug*, 154 Cal. App. 3d 780, 782–85 and 784 n.1, 201 Cal. Rptr. 676 (1984) (unvested stock options correctly allocated between compensation for services prior to and after date of separation because, under California Civil Code § 5118, postseparation earnings are separate property); *In re Marriage of Miller*, 915 P.2d 1314, 1316 (Colo. 1996) (marital property defined as "all property acquired by either spouse subsequent to the marriage" and prior to decree of legal separation); *Pascale* v. *Pascale*, 140 N.J. 583, 609, 660 A.2d 485 (1995) (property qualifies for distribution under state statute when it is attributable to efforts expended by either spouse during marriage even if benefit is not received until after dissolution); *DeJesus* v. *DeJesus*, 90 N.Y.2d 643, 647, 687 N.E.2d 1319, 665 N.Y.S.2d 36 (1997) (New York Domestic Relations Law defines marital property as "all property acquired by either or both spouses during the marriage"); *In re Marriage of Short*, 125 Wash. 2d 865, 870–75, 890 P.2d 12 (1995) (in community property jurisdictions, assets acquired during marriage are community property, assets acquired after marriage ends are separate property, unvested options are classified according to when acquired, which depends upon purpose for which they were granted).

a result of, and as additional compensation for, past services that were rendered prior to the filing date. The court reasoned that the past services to which the options related, having been performed during the marriage, were the product of the joint effort of both parties to the marriage and, therefore, the benefits that flowed from those services constituted marital property.

In *In re Marriage of Short*, 125 Wash. 2d 865, 890 P.2d 12 (1995), the husband claimed that unvested stock options granted to him by his employer as an incentive for future service were determined incorrectly to be community property. The court determined that options granted as an incentive for services to be rendered entirely after the date of dissolution do not constitute marital property because the acquisition of those options will be the result of the efforts of one spouse after the dissolution of the marriage. Id., 875. Similarly, in *In re Marriage of Miller*, 915 P.2d 1314 (Colo. 1996), the Colorado Supreme Court, following *In re Marriage of Short*, decided that "an employee stock option granted in consideration of future services does not constitute marital property until the employee has performed those future services"; id., 1319; and concluded that the case had to be remanded for additional fact-finding as to whether the options were awarded for past or future services before the options could be distributed. Id.

In *In re Marriage of Miller*, the court also recognized that options may be granted in part as compensation for past service and in part as an incentive for future service. Id., 1318. Several other jurisdictions also have been called upon to classify unvested options that were granted for a purpose or purposes that did not correspond to services performed wholly during or wholly after the marriage. The majority of these courts have concluded that, under such circumstances, the

unvested options contain elements of both marital and nonmarital property and, therefore, should be apportioned between marital and nonmarital assets through application of a "time rule"[7] or other method.[8] The New York Court of Appeals explained the approach it adopted, based on *In re Marriage of Miller*, as follows: "[T]he marital portion of stock plans is a function of four separate calculations: (1) the relative shares traceable to past and future services must be determined; (2) any portions of the stock plans which are intended as compensation for past services are deemed marital property to the extent that the marriage coincides with the period of the titled spouse's employment up until the time of the grant; (3) of that portion intended as incentive for future services, the marital portion is

[7] In *In re Marriage of Hug*, 154 Cal. App. 3d 780, 201 Cal. Rptr. 676 (1984), a time rule method of apportionment of unvested stock options between community and separate property was first approved of by an appellate court. The number of options that constituted community property was determined to equal the "product of a fraction in which the numerator is the period in months between the commencement of the [employee spouse's] employment by the employer and the date of separation of the parties, and the denominator is the period in months between commencement of the employment and the date when each option is first exercisable, multiplied by the number of shares which can be purchased on the date the option is first exercisable." Id., 782. The remaining options are the separate property of the employee spouse. Id., 782–83. Since *In re Marriage of Hug*, other jurisdictions have adopted time rule methods of apportionment. See, e.g., *DeJesus* v. *DeJesus*, 90 N.Y.2d 643, 687 N.E.2d 1319, 665 N.Y.S.2d 36 (1997); *Salstrom* v. *Salstrom*, 404 N.W.2d 848 (Minn. App. 1987); *In re Marriage of Short*, supra, 125 Wash. 2d 865; *Kapfer* v. *Kapfer*, 187 W. Va. 396, 419 S.E.2d 464 (1992).

[8] See *In re Marriage of Brown*, 15 Cal. 3d 838, 544 P.2d 561, 126 Cal. Rptr. 633 (1976); *In re Marriage of Hug*, 154 Cal. App. 3d 780, 201 Cal. Rptr. 676 (1984); *In re Marriage of Miller*, supra, 915 P.2d 1314; *In re Marriage of Frederick*, 218 Ill. App. 3d 533, 578 N.E.2d 612 (1991); *Goodwyne* v. *Goodwyne*, 639 So. 2d 1210 (La. App. 1994); *Salstrom* v. *Salstrom*, 404 N.W.2d 848 (Minn. App. 1987); *Garcia* v. *Mayer*, 122 N.M. 57, 920 P.2d 522 (App. 1996); *DeJesus* v. *DeJesus*, 90 N.Y.2d 643, 687 N.E.2d 1319, 665 N.Y.S.2d 36 (1997); *In re Marriage of Powell*, 147 Or. App. 17, 934 P.2d 612 (1997); *Dietz* v. *Dietz*, 17 Va. App. 203, 436 S.E.2d 463 (1993); *In re Marriage of Short*, supra, 125 Wash. 2d 865; *Kapfer* v. *Kapfer*, 187 W. Va. 396, 419 S.E.2d 464 (1992).

determined by a time rule . . . and (4) all portions found to be marital property may be divided between the spouses." *DeJesus* v. *DeJesus*, 90 N.Y.2d 643, 650, 687 N.E.2d 1319, 665 N.Y.S.2d 36 (1997).

By contrast, a minority of jurisdictions have adopted per se rules applicable to unvested stock options that do not require a fact specific analysis of when the options were earned. A few have decided that regardless of the purpose for which they were granted, stock options that are not exercisable at the end of a marriage are not marital property; see *Hann* v. *Hann*, 655 N.E.2d 566 (Ind. App. 1995); *Hall* v. *Hall*, 88 N.C. App. 297, 363 S.E.2d 189 (1987); *Ettinger* v. *Ettinger*, 637 P.2d 63 (Okla. 1981); and others have decided that stock plans granted during a marriage are wholly marital property. See *Green* v. *Green*, 64 Md. App. 122, 494 A.2d 721 (1985); *Smith* v. *Smith*, 682 S.W.2d 834 (Mo. App. 1984); *Chen* v. *Chen*, 142 Wis. 2d 7, 416 N.W.2d 661 (App. 1987).

We are persuaded that the majority approach that apportions unvested stock options between marital and nonmarital property according to when the options were earned provides the most appropriate method of classification under § 46b-81. The majority approach is analogous to the approach adopted in *Sunbury* wherein this court considered how and when the asset at issue was earned in classifying it as nonmarital property. *Sunbury* v. *Sunbury*, supra, 216 Conn. 676–77. In addition, by allowing for apportionment of the options between marital and nonmarital property based upon the contributions of each spouse toward their acquisition, the majority approach advances the equitable purpose underlying § 46b-81 of recognizing the contributions of both spouses in a joint enterprise.

In this case, the plaintiff and the defendant disagree as to when the fourth and fifth flights of stock options were earned. The plaintiff contends that the options

were earned during the marriage when the defendant performed employment services as a government affairs representative and, therefore, contends that the options are marital property in their entirety. According to the plaintiff, the defendant's termination agreement is evidence that the stock options were intended solely as additional compensation for past services rather than as consideration for future services, because, under the termination agreement, the defendant's prospective responsibilities represented only contingencies, not affirmative obligations to be performed after the date of dissolution. The defendant argues that only the fourth flight of stock options contained an element of marital property, and that the fifth flight was earned entirely after the dissolution. Specifically, the defendant contends that he was allowed to retain the opportunity to exercise the fourth and fifth flights of stock options in exchange for his promise to abide by the terms of the termination agreement—including the promise not to accept employment that conflicts with the interests of Southern Industries and the promise not to divulge Southern Industries' trade secrets—which he was to perform in part prior to and in part subsequent to the dissolution. Therefore, he argues, that only a portion of the fourth flight of options and none of the fifth flight was available for distribution to the plaintiff. For the reasons that follow, we agree with the plaintiff's argument, and conclude that the trial court properly determined that the fourth and fifth flights of stock options represented marital property in their entirety.

The trial court did not state explicitly that it determined the fourth and fifth flights of options to be marital property. Implicit in its decision to distribute the options without identifying any portion of them as after-acquired property, however, is its conclusion that the options were marital property in their entirety. Because

we have already concluded that the options would constitute marital property if they were earned during the marriage, we review whether the trial court properly could have concluded that the options were earned entirely during the marriage. Our review is guided by the well established principle that "[t]he resolution of conflicting factual claims falls within the province of the trial court . . . [and] [t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole." (Internal quotation marks omitted.) *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 762, 674 A.2d 1313 (1996).

The evidence before the trial court consisted of the following: (1) undisputed evidence demonstrating that the fourth and fifth flights of options were granted to the defendant during the marriage; (2) undisputed evidence demonstrating that the termination agreement, which allowed him to retain the options, was entered into during the marriage; (3) undisputed evidence demonstrating that the performance of the terms of the agreement commenced during the marriage; (4) undisputed evidence demonstrating that the defendant was required to adhere to the terms of the termination agreement for approximately fifteen months beyond the date of dissolution of the marriage; and (5) undisputed evidence that, under the terms of the agreement, the defendant ceased to have any other employment related responsibilities after December, 1995.

The trial court also had before it a copy of the defendant's termination agreement. That agreement, in substance, contained the following mutual covenants: (1) the defendant and his employer mutually agreed to release each other from any and all claims and causes of action of any kind arising before the date of the agreement; (2) the defendant promised not to disclose

or use any trade secret of the employer; (3) the defendant promised not to obtain any employment that conflicts with the interests of the employer; (4) the employer promised to continue the defendant's employment in a technical sense until October 1, 1997, although after December 31, 1996, that employment would be compensated in the amount of $1 for the entire period from January 1, 1997, through October 1, 1997, without life, health, or dental insurance benefits, but with the opportunity to qualify for profit sharing and stock option benefits; (5) the defendant promised to continue such employment; (6) the defendant acknowledged that his position as vice president of government affairs terminated in July of 1995, although his employment continued after that date; and (7) the parties mutually agreed to cause no injury to the other party or that party's reputation or in any way harm, embarrass, or reflect negatively upon the other party, or damage the other party's business in any way.

On the basis of the evidence, the trial court properly determined that the fourth and fifth flights of options constituted marital property in their entirety.[9] Although the defendant was subject under the agreement to certain restrictions beyond the date of dissolution, the defendant alone had complete control over whether he would abide by those restrictions. The options could not be unilaterally withdrawn by Southern Industries. Furthermore, the defendant did not have to perform any affirmative acts in order to retain the options, but only had to refrain from certain actions for a limited period. Under the circumstances, the restrictions qualitatively were more closely analogous to other contingencies typically associated with deferred benefits, such as the requirement that a pension beneficiary

---

[9] The defendant did not argue, and there was no other indication, that Southern Industries allowed him to retain the ability to exercise the unvested options in lieu of a severance package intended to replace lost future income.

attain a certain age before the benefits will be paid or the requirement that under a trust the beneficiary be alive at the time when the trust corpus is to be distributed, than they were to future services. Such contingencies do not provide the consideration for which the deferred benefits are granted, and are not indicative that the benefits will be earned in part after the date of dissolution. See *In re Marriage of Grubb,* 745 P.2d 661 (Colo. 1987) (where husband's right to receive pension benefits was contingent on his continued employment and survival to retirement age court considered benefits to have already been earned; contingency affected only present value of benefits); *Moore* v. *Moore,* 114 N.J. 147, 553 A.2d 20 (1989) (cost of living increases associated with pension are property accrued during marriage because they relate to past contributions rather than to future personal efforts of beneficiary). Indeed, in this case, the very fact that the agreement allowing the defendant to retain the options was a termination agreement requiring no further services indicates that the options were earned by the defendant during the marriage when he provided past services and that it was in exchange for those services that the defendant was paid his salary through December, 1996, and was offered the opportunity to retain the options.[10] Therefore, we conclude that the trial court properly determined that the fourth and fifth flights of stock options were distributable under § 46b-81.[11]

---

[10] In concluding that the stock options were earned wholly during the marriage, we do not mean to indicate that the contingencies to which the options were subject would have been irrelevant to the trial court's property distribution. In this case, the contingencies could have been factored into the court's decision as an element affecting their valuation. For example, the possibility that in the event of a breach of the agreement the defendant might never have received the options, and the fact that the present value of the options could not be predicted with complete certainty due to unknown factors, such as the price at which the stock would be trading on the dates when the options become exercisable, would be an appropriate factor to consider in valuing the options.

[11] The defendant argued that, if we were to determine that the stock options were earned in part prior to and in part subsequent to the date of

## II

The defendant next claims that, even if the fourth and fifth flights of stock options represented marital property subject to distribution under § 46b-81, the trial court nevertheless abused its discretion when it distributed a portion of those options to the plaintiff. The defendant's argument is twofold. First, the defendant contends that there was insufficient evidence before the trial court to allow it to value the fourth and fifth flights of options. Second, the defendant contends that even if the court properly could have valued the fourth and fifth flights of options, the equities of the case precluded it from awarding any portion of those options to the plaintiff. Although the plaintiff does not address the issue of valuation, she contended at oral argument that the defendant's financial affidavit contained enough information to allow the court to estimate the value of the fourth and fifth flights of options. The plaintiff also disputes that the fourth and fifth flights of options were the product of the defendant's efforts alone and argues that the equities of the case entitled her to a share of those benefits. We conclude that the record contained enough evidence to allow the court to estimate the value of the fourth and fifth flights of stock options, and that it was not inequitable for the court to award a portion of those options to the plaintiff.

"With respect to the financial awards in a dissolution action, great weight is given to the judgment of the trial court because of its opportunity to observe the parties and the evidence." (Internal quotation marks omitted.) *Holley* v. *Holley*, 194 Conn. 25, 29, 478 A.2d 1000 (1984).

dissolution, we should apply a time rule method of apportionment such as the method set forth in *In re Marriage of Hug*, 154 Cal. App. 3d 780, 782, 201 Cal. Rptr. 676 (1984), to determine the portion of the fourth and fifth flights of options that represent marital property. Because, however, we have already determined that the options are marital property in their entirety, there is no need to employ a time rule in this case.

"Our function in reviewing such discretionary decisions is to determine whether the decision of the trial court was 'clearly erroneous in view of the evidence and pleadings in the whole record.' Practice Book § 4061 [now Practice Book (1998 Rev.) § 60-5]." *Turner* v. *Turner*, 219 Conn. 703, 709, 595 A.2d 297 (1991). In other words, "judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did." (Internal quotation marks omitted.) *Holley* v. *Holley*, supra, 29. In making those determinations, we allow "every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Charpentier* v. *Charpentier*, 206 Conn. 150, 154–55, 536 A.2d 948 (1988).

## A

We first address the defendant's claim that the evidence in the record was insufficient to allow the court to value the fourth and fifth flights of options. In distributing the assets of the marital estate, the court is required by § 46b-81 to consider the estate of each of the parties. Implicit in this requirement is the need to consider the economic value of the parties' estates. The court need not, however, assign specific values to the parties' assets. *Burns* v. *Burns*, 41 Conn. App. 716, 721, 677 A.2d 971, cert. denied, 239 Conn. 906, 682 A.2d 997 (1996); *Puris* v. *Puris*, 30 Conn. App. 443, 450, 620 A.2d 829 (1993); *Oneglia* v. *Oneglia*, 14 Conn. App. 267, 271–72, 540 A.2d 713 (1988). In assessing the value of the assets that comprise the marital estate, the trial court functions as the trier of fact. "The trial court has the right to accept so much of the testimony . . . as [it] finds applicable . . . ." *Turgeon* v. *Turgeon*, 190 Conn. 269, 274, 460 A.2d 1260 (1983). "[It] arrives at [its] own conclusions by weighing the opinions of the

appraisers, the claims of the parties, and [its] own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation." Id. In selecting and applying an appropriate valuation method, the trial court has considerable discretion. *Krafick* v. *Krafick*, supra, 234 Conn. 799. The trial court's findings will be overturned only if it "misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Internal quotation marks omitted.) *Turgeon* v. *Turgeon*, supra, 274. "As with other questions of fact, unless the determination by the trial court is clearly erroneous, it must stand." Id., 275–76; *Kaplan* v. *Kaplan*, 186 Conn. 387, 392, 441 A.2d 629 (1982).

In this case, the defendant submitted very little evidence pertaining to the value of the fourth and fifth flights of stock options, and the plaintiff submitted no such evidence. Specifically, the record contained: (1) the financial affidavits of each of the parties; (2) a copy of the defendant's termination of employment agreement; and (3) the testimony of the parties as to their knowledge of the stock options.

The stock options were all either owned or to be acquired on a future date by the defendant. As a result, the plaintiff did not list any of the stock options as an asset on her financial affidavit. The defendant's affidavit included the stock options under the section designated for deferred compensation plans. The defendant listed the sum of $250,128 under the section designated for the total value of all deferred compensation, and included the following description under the remainder of the section: "ESOP—stock options vest at end of each year for 5 years if the employee remains w/ co.— 30K shares total—3/5 vested for 18K shares at $42.66 (NYSE) purchased at $19.50 per contract—18K x $23.16 = $416,880.00 less capital gains—vested options

have not yet been exercised—$250,128.00." This entry provided a value and corresponding method of calculation only for the first three flights of stock options that had already vested as of the time of trial. Although the description acknowledged that the defendant possessed other options that had not yet vested, it did not attempt to assign a present value to the defendant's interest in those options.

At trial the defendant's attorney did not question him directly about the value of the fourth and fifth flights of stock options. The plaintiff's attorney did elicit testimony from the defendant regarding the stock options. Specifically, the defendant was asked about the vesting dates of all of the options and whether the defendant considered all of his assets, including the options, to have been earned during the marriage. In response to the questioning, the defendant testified as follows: "The house was not earned during the course of the marriage, but the other assets—it depends on how you look at it. For instance, the stock options only triggered at a certain date. By the time [the plaintiff] filed for dissolution only one fifth of the original 30,000 share grant had triggered. I've never known in my own mind—or recall a nonavailable asset that is a nonvested stock option—whether you call that an option or not. It's not like you can go to the bank and spend it or call up somebody and say 'give me my stock' or 'I want to trade that today.' I've never known how to consider that in my own mind." The plaintiff's attorney also inquired about the terms of the termination agreement under which the options were to be received. The defendant testified: "I have no ongoing duties [with Southern Industries]. I have a severance agreement . . . . I am allowed to remain on the payroll at a rate of $1 per year until October 1, 1997. . . . So I can technically be called an employee, and the last flight of my stock

options can vest, which can only happen if I am an employee."

The court itself inquired about the stock options as follows: "Mr. Bornemann, you indicated that you are going to stay on at $1 a year so that some stock options will vest . . . by October 1, 1997 . . . . [Y]ou said those stock options are not your ESOP [employee stock ownership plan] options because those options are five years in options and on a deferred [compensation] plan . . . but you also told [the plaintiff's attorney] that this [affidavit] includes everything you have, and [there are] no stock options listed anywhere else on your financial. Did you just not list them . . . ?" In response to the court's questioning, the defendant explained that the stock options listed on his financial affidavit were the same options that were referred to in his termination agreement, and were improperly labeled as "ESOP" options. In addition, two days before the court issued its ruling, the defendant testified that the stock had closed on the previous day at "[f]orty and an eighth, down two."

Although the evidence before the court as to the value of the fourth and fifth flights of stock options certainly could have been provided in much greater detail and with much greater precision—perhaps by an expert witness who could have offered projections as to the present value of the fourth and fifth flights of options—neither party chose to introduce such evidence. The defendant, as the beneficiary of the contract under which the right to exercise the options was granted, was required to list and did list the options on his financial affidavit. Practice Book (1998 Rev.) § 25-30, formerly § 463. The defendant cannot claim that he lacked notice that the fourth and fifth flights of options might be distributed by the court. The fact that he held a contractual right to those options was part of the record in the case and his right to exercise the options

was explored during the proceedings. That he opted not to provide an estimate of the present value of the fourth and fifth flights of options, but chose instead to indicate in his testimony that he did "not know how to consider" the unvested options and imply by his failure to value them that the options were worth nothing, is not a matter that he can complain about at this late date. The court was not required to accept his implicit indication that the unvested shares were worth nothing or were not capable of valuation in light of the other evidence to the contrary, namely, the termination agreement which placed within the defendant's control the ability eventually to exercise the unvested options, the fairly imminent dates on which the fourth and fifth flights of options would vest, the contract price at which the options could be exercised, and the price at which the stock was currently trading. Instead, on the basis of that evidence, the court reasonably could have estimated the present value of the fourth and fifth flights of options.

In *Krafick*, we noted that "although not expressly required by statute, a trial court, when utilizing a method to ascertain the value of a [deferred benefit], should reach that value on the record. Casting the judgment in specific amounts will make the result more comprehensible for the litigants and will facilitate appellate review as often as such review may become necessary." (Internal quotation marks omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 804. In the present case, our intention is not to indicate that we are retreating from that advice. Rather, we determine only that when neither party in a dissolution proceeding chooses to introduce detailed information as to the value of a given asset, neither party may later complain that it is not satisfied with the court's valuation of that asset. Both parties in a dissolution proceeding are required to itemize all of their assets in a financial affidavit and to

provide the court with the approximate value of each asset. Practice Book (1998 Rev.) § 25-30, formerly § 463. If the parties fail to do so, the equitable nature of the proceedings precludes them from later seeking to have the financial orders overturned on the basis that the court had before it too little information as to the value of the assets distributed. In this case, it was not a misapplication of the law for the trial court to have valued the asset on the basis of the scant evidence provided and to have distributed the asset on the basis of that valuation. The fact that neither party advocated a sophisticated method of valuation nor provided any particularly detailed or precise evidence of value in regard to the fourth and fifth flights of stock options did not preclude the trial court from equitably distributing those options.

B

The second element of the defendant's claim that the trial court abused its discretion in distributing the fourth and fifth flights of stock options is that the equities of the case precluded the distribution of any portion of those assets to the plaintiff. Specifically, the defendant argues that because the plaintiff did not contribute to the defendant's negotiation of the termination agreement that allowed him to retain the opportunity eventually to exercise the fourth and fifth flights of options, and because the plaintiff did not contribute to his performance of the terms of that agreement, she was not entitled to share in the benefits of that agreement. The basis of the defendant's claim is that he alone earned the fourth and fifth flights of stock options after the date of his separation from the plaintiff.

Although § 46b-81 indicates that it is the date of dissolution, rather than the date of separation, on which the parties marital assets are to be determined; *Sunbury*

v. *Sunbury*, supra, 216 Conn. 676; the date of separation may be of significance in determining what is equitable at the time of distribution. In distributing property pursuant to § 46b-81, the court is instructed to consider the contribution of each spouse in the acquisition, preservation and appreciation of the marital estate. After the date of separation, it is not difficult to conceive that one spouse may acquire a particular asset without any contribution from the other spouse.

In this case, the plaintiff filed for divorce in January, 1994, and the parties officially separated in July, 1994. Beginning in August, 1994, the parties assumed equal responsibilities with respect to Marshall's care, each acting as caretaker for three and one-half days per week. The defendant argues that from that point in time onward, the plaintiff's role as family homemaker and primary caretaker of Marshall came to an end, such that the plaintiff no longer contributed to the defendant's ability to fulfill his employment responsibilities. As a result, the defendant argues, by the time his employment as government affairs representative terminated in July, 1995, and he had negotiated the terms of his termination agreement, any contributions by the plaintiff to his employment accomplishments had long since ceased. The defendant contends that, as a result, there was no basis for awarding the plaintiff one half of the fourth flight of stock options, and that the fourth and fifth flights of options should have been awarded to the defendant in addition to an equitable share of the remaining assets because they were the product of his efforts alone.

Although it certainly would have been within the court's discretion to decide that the plaintiff had not contributed to the acquisition, preservation or appreciation of the fourth and fifth flights of stock options under the particular circumstances, we cannot say that it was an abuse of discretion for the court not to have reached

that conclusion. As we have already discussed, the court reasonably determined, based upon the evidence in the record, that those flights of options were awarded as compensation for past services performed prior to the defendant's termination. The court also reasonably could have determined that the past services performed by the defendant between July, 1994, the date of separation, and July, 1995, the date of termination, had been made possible by the plaintiff's earlier contributions as homemaker and primary caretaker of Marshall and that, therefore, she was entitled to share in the resulting benefits. In any event, although the court was required to consider the contributions of each spouse toward the acquisition, preservation or appreciation of their estates, this consideration was not the controlling factor. In distributing property in a dissolution proceeding, "[t]he court must consider *all* of [the statutory] criteria." (Emphasis in original.) *Caffe* v. *Caffe*, 240 Conn. 79, 82, 689 A.2d 468 (1997). "[N]o single criterion is preferred over the others, and the court is accorded wide latitude in varying the weight placed upon each item under the peculiar circumstances of each case." (Internal quotation marks omitted.) *Sunbury* v. *Sunbury*, 210 Conn. 170, 174, 553 A.2d 612 (1989); see *Valante* v. *Valante*, 180 Conn. 528, 531, 429 A.2d 964 (1980). Therefore, we conclude that the trial court's award of one half of the fourth flight of stock options to the plaintiff did not constitute an abuse of discretion.

III

The defendant next claims that the trial court abused its discretion in awarding rehabilitative alimony to the plaintiff. Specifically, the defendant contends that no rehabilitative alimony was warranted because the plaintiff had the opportunity, during the two year long period of separation throughout which she received pendente lite support, to search for employment and attain self-sufficiency, and that in light of the plaintiff's college

education and experience in both paid employment and charitable service the award of an additional eighteen months of alimony was unreasonable. The plaintiff argues, conversely, that the court's decision to award a limited amount of rehabilitative alimony was reasonable in light of the fact that she had not been employed full-time in several years, had acquired only limited employment experience after graduating from college before marrying, giving birth to a child, and leaving her employment to become a homemaker, and during the two year period of separation she had continued to work part-time and as a volunteer and to provide 50 percent of the care for the parties' special needs child. We conclude that the trial court's decision did not constitute an abuse of discretion.

Section 46b-82 governs awards of alimony. That section requires the trial court to consider "the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment" in ordering either party to pay alimony to the other. In awarding alimony, "[t]he court must consider *all* of these criteria. . . . It need not, however, make explicit reference to the statutory criteria that it considered in making its decision or make express findings as to each statutory factor." (Citation omitted; emphasis in original.) *Caffe* v. *Caffe*, supra, 240 Conn. 82–83. In particular, rehabilitative alimony, or time limited alimony, is alimony that is awarded primarily for the purpose of allowing the spouse who receives it to obtain further education, training, or other skills necessary to attain self-sufficiency. *Cooley* v.

*Cooley,* 32 Conn. App. 152, 164–65, 628 A.2d 608, cert. denied, 228 Conn. 901, 634 A.2d 295 (1993). Rehabilitative alimony is not limited to that purpose, however, and there may be other valid reasons for awarding it. *Roach* v. *Roach,* 20 Conn. App. 500, 506, 568 A.2d 1037 (1990).

In this case, the trial court's opinion demonstrates that the court considered the statutory criteria when it decided to award rehabilitative alimony to the plaintiff and that it awarded the alimony for a valid reason— namely, to allow the plaintiff to obtain employment that would lead to self-sufficiency. Indeed, the record contains explicit references to virtually all of the statutory criteria. The court announced its decision to award alimony as follows: "Let this court emphasize that this is a short marriage. It has been [in pendente lite status] for two years now and the court has already made findings about working abilities. The court orders commencing September 1, 1996, [the defendant] to pay [the plaintiff] alimony in the amount of $400 per week for eighteen months to sooner terminate on either party's death, [the plaintiff's] remarriage or her living with another man. . . . This is a very short window of opportunity for [the plaintiff] to [obtain] employment . . . ."

The record demonstrates that, in addition to the criteria that the court referred to in the preceding statement, the court had already considered the remaining statutory criteria. The record contains references to the court's determination that neither party was at fault for the breakdown of the marriage, and contains findings that the court had made as to the age of the parties, the family health concerns pertaining to Marshall, the station in life that the parties had achieved as well as the station in life to which they had aspired, their present employability, employment history and employment skills, the amount and sources of their respective

incomes, the estate and needs of each of the parties, and the desirability of each party securing employment in light of the arrangement awarding joint physical custody. Furthermore, distribution of the parties' property was announced at the same time and all of the financial orders appear to have been fashioned as an integrated whole. The court's statement demonstrates that it took the two year period of separation into account in assessing the plaintiff's needs in achieving self-sufficiency. The trial court's conclusion that rehabilitative alimony was appropriate will not be disturbed unless it resulted from an incorrect application of the law or is not reasonably supported by the record. In this case, the record supports the correctness of the court's application of the law as well as the reasonableness of the court's decision. We conclude, therefore, that the award of rehabilitative alimony did not constitute an abuse of discretion.

## IV

The defendant also claims that the trial court abused its discretion in awarding attorney's fees to the plaintiff. The defendant contends that the award was improper because: (1) in awarding the attorney's fees, the court failed to find explicitly that denial of an award would undermine its other financial orders; (2) the plaintiff had ample liquid funds with which to pay her own attorney's fees; and (3) the effect of the award is to reward the plaintiff for misusing funds that were previously ordered by the court to be set aside for attorney's fees and costs. The plaintiff disputes that she had ample liquid funds with which to pay her own attorney's fees and contends that the court was not required to make an explicit finding that the denial of an award of attorney's fees would undermine the other financial awards before awarding attorney's fees on the basis of a party's lack of liquid funds with which to pay their own fees. The plaintiff also argues that the court took

into consideration that both parties had violated the pendente lite orders in misusing funds designated for attorney's fees and, therefore, the award of attorney's fees was not improper on that basis.

General Statutes § 46b-62[12] governs the award of attorney's fees in dissolution proceedings. That section provides in part that "the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ." The criteria set forth in § 46b-82 are "the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment." In making an award of attorney's fees under this section, "[t]he court is not obligated to make express findings on each of these statutory criteria." *Weiman* v. *Weiman,* 188 Conn. 232, 234, 449 A.2d 151 (1982).

---

[12] General Statutes § 46b-62 provides: "Orders for payment of attorney's fees in certain actions. In any proceeding seeking relief under the provisions of this chapter and sections 17b-743, 17b-744, 45a-257, 46b-1, 46b-6, 46b-204, 47-14g, 51-348a and 52-362, the court may order either spouse or, if such proceeding concerns the custody, care, education, visitation or support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. If, in any proceeding under this chapter and said sections, the court appoints an attorney for a minor child, the court may order the father, mother or an intervening party, individually or in any combination, to pay the reasonable fees of the attorney or may order the payment of the attorney's fees in whole or in part from the estate of the child. If the child is receiving or has received state aid or care, the reasonable compensation of the attorney shall be established by, and paid from funds appropriated to, the Judicial Department."

"Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so." (Internal quotation marks omitted.) *Koizim* v. *Koizim*, 181 Conn. 492, 501, 435 A.2d 1030 (1980). An exception to the rule announced in *Koizim* is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would "undermine its prior financial orders . . . ." (Internal quotation marks omitted.) *Eslami* v. *Eslami*, 218 Conn. 801, 820, 591 A.2d 411 (1991). "Whether to allow counsel fees [under §§ 46b-62 and 46b-82], and if so in what amount, calls for the exercise of judicial discretion." (Internal quotation marks omitted.) *Holley* v. *Holley*, supra, 194 Conn. 33–34. " 'An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did.' " *Unkelbach* v. *McNary*, 244 Conn. 350, 374, 710 A.2d 717 (1998), quoting *Cook* v. *Bieluch*, 32 Conn. App. 537, 544, 629 A.2d 1175, cert. denied, 228 Conn. 910, 635 A.2d 1229 (1993).

In this case, the court ordered the defendant to pay $16,000 toward the plaintiff's attorney's fees, which amounted to $27,000 in total. The court ordered the award as part of a laundry list of financial orders and did not explain why it was awarding attorney's fees. The other financial orders awarded to the plaintiff the family residence in Madison along with some of its contents, the family automobile, certain shares of stock and stock options, and miscellaneous other assets, such as the $500 in her checking account. The plaintiff was also awarded $400 per week in alimony for eighteen months, and the defendant was ordered to pay her $247

per week in child support and to maintain various insurance policies for the benefit of Marshall.

The defendant relies on *Maguire* v. *Maguire*, 222 Conn. 32, 608 A.2d 79 (1992), for the proposition that it constitutes an abuse of discretion for the court to award attorney's fees when both parties are financially able to pay their own fees without finding explicitly in the record that the award is justified because without it the court's other financial orders would be undermined. In *Maguire*, this court reversed an award of attorney's fees because both parties possessed substantial liquid assets and were financially able to pay their own attorney's fees and the court had not made a finding that the award was necessary in order to avoid undermining its other financial awards. Id., 44–45. An award of $50,000 in attorney's fees had been issued to the plaintiff wife, who possessed more than $500,000 in liquid assets even before the financial award associated with the dissolution was made, and the financial orders divided the marital estate, which was valued in excess of $7,000,000, equally between the parties. In overturning the award, this court stated that "there is nothing in the record that would support . . . a finding" that the failure to award attorney's fees would undermine the court's other financial orders. Id., 45.

The present case is distinguishable from *Maguire* because here the record would support a finding by the trial court either that the plaintiff lacked sufficient liquid assets with which to pay her own attorney's fees, or that the failure to award attorney's fees would have undermined its other financial orders. In addition to owing $27,000 to her own attorneys, the plaintiff was ordered to pay one half of the attorney's fees for the parties' minor child, and one half of the fees for two expert witnesses. Of the significant assets that the plaintiff received in the distribution, only the shares of stock would have been easily convertible to liquid form; the

family residence and automobile were not liquid assets, the first three flights of stock options had not yet been exercised, and the fourth flight was not yet exercisable as of the date of dissolution. Further, the shares of stock owned outright that were awarded to the plaintiff were not worth an amount sufficient to cover all of the fees owed. As a result, the court reasonably could have concluded that unless it awarded attorney's fees to the plaintiff, its other financial orders would be undermined, or that the plaintiff lacked the liquidity necessary to enable her to pay her own fees. We conclude, therefore, that the award of attorney's fees did not constitute an abuse of the court's discretion.

V

The defendant's final claim is that the trial court improperly awarded to him as part of the property distribution items that neither he nor the plaintiff owned but as to which the defendant held only a contractual right to purchase. In light of our conclusion in part I of this opinion that contractual rights represent intangible property interests that are subject to distribution under § 46b-81, we conclude that the right to purchase the contents of the defendant's rented apartment was property subject to distribution under § 46b-81 and, therefore, was properly distributed by the trial court.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN and NORCOTT, Js., concurred.

MCDONALD, J., dissenting. I dissent from the release of this opinion.

The listing of the justices at the beginning of the majority opinion would indicate that I fully participated in this decision and the majority opinion notes[1] that I

---

[1] Footnote 13 of the majority opinion, when released, stated: "A separate opinion on the merits by Justice McDonald will follow at a later date."

will file an opinion at a later time.[2] This opinion was released, however, before I was able to carefully and completely consider the issues and fully express my views.

I believe no opinion should be released before each justice has an opportunity to consider and decide the issues and compose an opinion. I believe I have an obligation to consider the views of each justice.

As a member of the court of last resort, wielding tremendous power to affect the lives and future of Connecticut's people, I believe this is my constitutional and statutory duty.

---

[2] After the release of this opinion, the defendant filed a motion to reargue, based in part on the fact that I did not participate in the resolution of the case. If that motion had been granted, I would have participated in the reconsideration by joining the majority opinion or filing a separate opinion. During the pendency of the motion to reargue, the parties settled their differences and the defendant withdrew his motion. Because the issues in the case have become moot, I decline to file any supplemental opinion. "Where the actions of the parties themselves cause a settling of their differences, the case becomes moot." *Sobocinski* v. *Freedom of Information Commission,* 213 Conn. 126, 134, 566 A.2d 703 (1989).