******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., concurring in part and dissenting in part. The majority concludes that the trial court improperly denied the motion of the plaintiff, Catherine Reville, to open and set aside the judgment dissolving her marriage to the defendant, John Reville, on the basis of allegations that the defendant committed fraud by failing to disclose an unvested pension benefit on his financial affidavits during predissolution settlement negotiations. The majority specifically disagrees with the trial court's determination that (1) it was necessary to resolve the question of whether the benefit constituted distributable marital property under General Statutes (Rev. to 2001) § 46b-81 in order to determine whether the defendant committed fraud, (2) the law at the time of the dissolution proceedings definitively established that the benefit did not constitute distributable marital property, and (3) in light of the foregoing, there was no need to consider evidence of the value of the benefit in deciding whether the defendant committed fraud. Rather, the majority concludes that the defendant was "legally obligated" to disclose the existence and characteristics of the unvested pension benefit during the predissolution settlement negotiations, regardless of whether the benefit constituted distributable marital property. The majority also concludes that the trial court's decision not to allow expert testimony on the value of the benefit undermined its factual finding that the defendant disclosed the benefit to the plaintiff, thus causing the court to commit reversible evidentiary error when it determined that the defendant did not commit fraud. I disagree with these conclusions because the majority disregards the legal grounds on which the plaintiff's motion to open was based, namely, that the unvested pension benefit constituted distributable marital property and that the defendant's failure to disclose it not only caused her to rely to her detriment on a false representation of his assets, but was a clear violation of the parties' separation agreement. The majority also misconstrues this court's precedent on the disclosure of property interests in dissolution proceedings and takes an untenable position with respect to the trial court's factual finding that the defendant disclosed the benefit to the plaintiff. Accordingly, although I join in part III of the majority's opinion regarding the plaintiff's burden of proof, I respectfully dissent from parts I and II.

I

The majority first concludes that the trial court was not required to determine whether the defendant's unvested pension benefit constituted distributable marital property in May, 2001, because "any retirement or employment benefit potentially receivable by a party

to a dissolution action should be disclosed [in] that party's financial affidavit along with all known details as to its value, vesting requirements and current status . . . regardless of whether it . . . [is] classified as distributable marital property." (Emphasis omitted; footnotes omitted.) I disagree.

The majority loses sight of the legal grounds on which the plaintiff's motion was based. The plaintiff's original motion alleged that the defendant committed fraud when he failed to disclose in his financial affidavit "*a significant asset which would have been property subject to division under § 46b-81*," specifically, an unvested pension benefit of substantial value.[1] (Emphasis added.) Approximately four months later, the plaintiff requested permission to amend her motion in order to allege, as a second ground on which to open the judgment, that the defendant's failure to disclose the benefit was a violation of the parties' separation agreement. Paragraph 13.11 of the separation agreement provided in relevant part: "If it is established by a preponderance of the evidence that a party misrepresented or intentionally concealed *a property interest*, the effect thereof or an important characteristic thereof, the interest of the concealing party will be transferred *in full* to the nonconcealing party and the concealing party will pay all costs, fees, expenses, attorney's fees, and damages of the nonconcealing party caused by said concealment." (Emphasis added.) The plaintiff noted that the proposed amendment would allow her to seek enforcement of the remedies established by paragraph 13.11, which she claimed were "appropriate and commensurate" with the allegations of nondisclosure and fraud in her original motion.[2] In other words, a determination that the benefit constituted distributable marital property on the date of dissolution would allow the plaintiff to seek 100 percent of the benefit's value without subjecting all of the parties' other assets to further review and distribution by the court. Consequently, there can be no doubt that the principal issue raised in the plaintiff's motion required the trial court to make an initial determination as to whether the defendant's unvested pension benefit constituted distributable marital property.

The language in § 46b-81 also indicates that any resource[3] subject to assignment must be identified as property. As previously stated, the clearly articulated purpose of the plaintiff's motion was to obtain the full value[4] of the defendant's unvested pension benefit under § 46b-81, which provides in relevant part: "(c) *In fixing the nature and value of the property, if any, to be assigned*, the court . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acqui-

sition of capital assets and income. . . ." There is nothing in this language suggesting that a resource that is subject to assignment can be considered anything other than property. Accordingly, in addressing the plaintiff's claim that the unvested pension benefit was a resource subject to assignment that should have been disclosed, the trial court was required under § 46b-81 to determine initially whether the benefit constituted property.

This threshold determination also was required under the law that existed when the parties' divorce was finalized in May, 2001, which is the law that must be applied in resolving the issues in this case. Prior to that time, this court consistently took the position that, when it was unclear whether a particular resource was subject to division under § 46b-81, a determination first must be made as to whether it constituted property. For example, only six years earlier, the court had stated in *Krafick* v. *Krafick*, 234 Conn. 783, 663 A.2d 365 (1995), that the "first" step in considering the equitable distribution of resources in a dissolution proceeding is to determine "whether the resource is property within [the meaning of] § 46b-81 . . . ." Id., 792. Moreover, this was not a newly created principle but had been articulated and applied before *Krafick*, and continued to be applied thereafter. See, e.g., *Lopiano* v. *Lopiano*, 247 Conn. 356, 367, 752 A.2d 1000 (1998) (personal injury award deemed subject to equitable distribution following determination that award constituted property under § 46b-81); *Bornemann* v. *Bornemann*, 245 Conn. 508, 518, 752 A.2d 978 (1998) (unvested stock options in which employee had enforceable right deemed subject to equitable distribution following determination that options constituted property under § 46b-81); *Simmons* v. *Simmons*, 244 Conn. 158, 168, 708 A.2d 949 (1998) (medical degree not subject to equitable distribution because degree did not constitute property under § 46b-81); *Rubin* v. *Rubin*, 204 Conn. 224, 225, 232, 527 A.2d 1184 (1987) (interest in revocable inter vivos trust not subject to equitable distribution because trust did not constitute property under § 46b-81); *Krause* v. *Krause*, 174 Conn. 361, 364–65, 387 A.2d 548 (1978) (potential inheritance not subject to equitable distribution because it did not constitute property under predecessor to § 46b-81). Consequently, the trial court properly began its analysis of the plaintiff's claim by considering whether the defendant's unvested pension benefit constituted distributable marital property.[5]

II

The trial court ultimately determined that the defendant "did not have an 'existing enforceable right' in the [unvested pension benefit], which was, therefore, not marital property subject to division pursuant to . . . § 46b-81." I agree with this conclusion and believe the plaintiff's motion should have been denied on that ground. The trial court nonetheless conducted another

hearing to consider the question of fraud because the defendant's failure to bring the benefit to the attention of the plaintiff and the court during the litigation or to include it, "if only as a footnote, on his financial affidavit, prevented the court from fully performing its statutory duty under General Statutes [Rev. to 2001] § 46b-66 to find the agreement of the parties to be fair and equitable under all the circumstances, and/or to otherwise give due consideration to this factor in its award of alimony."[6] The majority likewise concludes that the unvested pension benefit should have been disclosed in May, 2001, regardless of its status as property. In reaching that conclusion, the majority relies on (1) the principle of full and frank disclosure articulated in *Billington* v. *Billington*, 220 Conn. 212, 219–22, 595 A.2d 1377 (1991), (2) the discussion of unaccrued pension rights in *Thompson* v. *Thompson*, 183 Conn. 96, 100, 438 A.2d 839 (1981), (3) the holding in *Bender* v. *Bender*, 258 Conn. 733, 749, 785 A.2d 197 (2001), that unvested pension benefits constitute distributable marital property, which the majority claims the defendant should have anticipated when preparing his financial affidavits, and (4) several statutory provisions pertaining to financial orders in dissolution proceedings. See General Statutes (Rev. to 2001) § 46b-66[7] (court shall consider "financial resources . . . of the spouses" in reviewing separation agreements for fairness and equity); General Statutes (Rev. to 2001) § 46b-81 (c)[8] (court shall consider, inter alia, "the opportunity of each [party] for future acquisition of capital assets and income" in distributing marital property); General Statutes (Rev. to 2001) 46b-82[9] (court shall consider, inter alia, "[each party's] amount and sources of income" in ordering alimony). In my view, none of these authorities supports the majority's conclusion.

A

The majority first determines that the defendant should have disclosed the unvested pension benefit in his financial affidavits under the principle of full and fair disclosure set forth by this court in *Billington*. To the extent the court in *Billington* articulated a principle of general applicability that might have guided the trial court in May, 2001, however, it was limited to the accuracy of the information provided by the parties regarding assets or interests that they *knew* were subject to disclosure under the relevant rules of practice, statutory provisions, and existing judicial precedent at that time. It is therefore improper for the majority to rely on *Billington* in concluding that the defendant should have disclosed his unvested pension benefit, *regardless* of its status as distributable marital property. As the court in *Billington* explained: "Our [rules of practice have] long required that at the time a dissolution of marriage . . . is claimed for a hearing, the moving party shall file a sworn statement . . . of current income, expenses, assets and liabilities, and pertinent records

of employment, gross earnings, gross wages and all other income. . . . The opposing party is required to file a similar affidavit at least three days before the date of the hearing . . . .

"Our cases have uniformly emphasized the need for full and frank disclosure in that affidavit. A court is entitled to rely upon the *truth and accuracy* of sworn statements required by [the rules of practice], and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding. . . . These sworn statements have great significance in domestic disputes in that they serve to facilitate the process and avoid the necessity of testimony in public by persons still married to each other regarding the circumstances of their formerly private existence." (Citations omitted; emphasis added; internal quotation marks omitted.) *Billington* v. *Billington*, supra, 220 Conn. 219–20.

The majority takes this language out of context and applies it in a manner unintended by the *Billington* court. The quoted passage in *Billington* had nothing to do with whether a particular resource was subject to disclosure but with the parties' obligation to disclose the true value of a resource previously disclosed as property in their financial affidavits.[10] See id. Consequently, it was the quality, amount and accuracy of the information provided by the defendant regarding the value of the resource, not whether the resource should have been disclosed in the first place, to which the court was referring in the quoted passage. See id. In fact, to my knowledge, this court *never* has relied on the principle of full and fair disclosure, either before or after *Billington*, in determining whether a resource was subject to disclosure when the law was unclear as to whether it should have been disclosed by the parties or considered by the trial court in entering its financial orders. See, e.g., *Bender* v. *Bender*, supra, 258 Conn. 749; *Lopiano* v. *Lopiano*, supra, 247 Conn. 367; *Bornemann* v. *Bornemann*, supra, 245 Conn. 518; *Simmons* v. *Simmons*, supra, 244 Conn. 164; *Krafick* v. *Krafick*, supra, 234 Conn. 798; *Rubin* v. *Rubin*, supra, 204 Conn. 232; *Thompson* v. *Thompson*, supra, 183 Conn. 100; *Krause* v. *Krause*, supra, 174 Conn. 364–65. Even in *Weinstein* v. *Weinstein*, 275 Conn. 671, 882 A.2d 53 (2005), which the majority cites but was decided four years following dissolution of the parties' marriage in the present case, the court invoked the principle of full and fair disclosure in discussing the allegedly fraudulent valuation of a resource the defendant previously had disclosed in his financial affidavit, not in determining whether an undisclosed resource *should have been* disclosed by the defendant. Id., 686–88; see also *Friezo* v. *Friezo*, 281 Conn. 166, 181–83, 191–93, 914 A.2d 533 (2007).

The majority does not put the cart before the horse but, rather, forgets the horse entirely. Only if it had been undisputed, which was not the case here, or the trial court had concluded, that the benefit was distributable marital property would it be appropriate for this court to apply the principle of full and fair disclosure in determining whether the defendant had committed fraud. Indeed, that is why, as previously discussed, the principle never has been applied to settle the question of whether a disputed resource should be disclosed in a dissolution proceeding. It is also why the trial court in the present case properly began its analysis, as other courts had done numerous times before, by considering whether the unvested pension benefit constituted distributable marital property.

The standard of full and fair disclosure, when applied to every resource, including a resource that has never been identified as property, is too broad to provide the parties and the courts with adequate guidance as to when disclosure is required because it provides no basis for distinguishing between resources that require disclosure and those that do not. In other words, without more specific guidance, parties would be required to disclose on their financial affidavits every conceivable resource, both present and future, to which they might be entitled, including a medical degree, a potential inheritance, or an interest in a revocable inter vivos trust, all of which this court had determined prior to May, 2001, were *not* interests subject to equitable distribution. See *Simmons* v. *Simmons*, supra, 244 Conn. 168 (medical degree); *Rubin* v. *Rubin*, supra, 204 Conn. 232 (revocable inter vivos trust); *Krause* v. *Krause*, supra, 174 Conn. 364–65 (potential inheritance). In contrast, when applied to a resource that the parties agree must be disclosed, such as income, real estate or a vested pension benefit, "full and fair disclosure" is easily understood and properly construed as referring to all of the available information regarding the nature and value of the resource. Consequently, the majority improperly relies on the principle of full and fair disclosure in concluding that the defendant should have disclosed his unvested pension benefit to the plaintiff in May, 2001.

B

The majority also relies on *Thompson* v. *Thompson*, supra, 183 Conn. 96, for the proposition that disclosure was required because a trial court may consider a party's "unaccrued pension benefits as [a] source of future income when fixing [the] property assignment and alimony orders . . . ." Text accompanying footnote 20 of the majority opinion. A close examination of the record and language in *Thompson*, however, reveals that the pension benefits at issue in that case were vested, unlike in the present case, and, accordingly, the reasoning in *Thompson* is inapposite.

In *Thompson*, one of the issues before the court was "the extent to which a trial court may take into account unaccrued pension rights . . . ." *Thompson* v. *Thompson*, supra, 183 Conn. 97. The plaintiff in *Thompson* argued that the trial court improperly had relied on "evidence of pension benefits [that she] would receive if she continued to work at her present job until [the] age [of] sixty-five"; id., 98; because the pension was "too speculative in nature to be considered by a court fashioning alimony and property assignment orders." Id., 100. This court disagreed, reasoning that "[p]ension benefits represent a form of deferred compensation for services rendered. . . . As such, they are conceptually similar to wages . . . [under §§ 46b-81 and 46b-82] . . . . Just as current and future wages are properly taken into account under these statutes, so may unaccrued pension benefits, a source of future income, be considered. . . .

"The . . . assertion that pension benefits are as uncertain and speculative as an expected inheritance is unsound. It is true that the exact amount of the benefits to be received often will depend upon whether the employee survives his retirement age, how long he lives after retirement and what his compensation level is during his remaining years of service. But these contingencies are susceptible to reasonably accurate quantification. . . . The present value of a pension benefit may be arrived at by using generally accepted actuarial principles . . . ." (Citations omitted; footnote omitted.) Id., 100–101.

Since *Thompson*, this court, as well as the majority in the present case, has misunderstood the decision as referring to unvested pension benefits. See *Krafick* v. *Krafick*, supra, 234 Conn. 794–95 n.20; *Bender* v. *Bender*, supra, 258 Conn. 743–44. When the court in *Thompson* referred to the pension benefits at issue as "unaccrued" benefits, however; *Thompson* v. *Thompson*, supra, 183 Conn. 97, 100, 101; it was not referring to unvested pension benefits but to pension benefits that would accrue in the future should the plaintiff continue to work for her employer until the age of sixty-five under a pension plan in which she *already had a vested interest*. See id., 100 n.3 (distinguishing between "unaccrued" pension benefits that would accrue in future under vested pension and "[v]ested" pension benefits that already have accrued). This conclusion is supported by the record in *Thompson* and the arguments in the parties' appellate briefs, all of which expressly referred to the plaintiff's admission that her pension had "vested" and that the question before the court was whether the increase in her retirement benefits from her continued employment until the age of sixty-five should be considered by the court in its property division and alimony orders. See id., 99–100. *Thompson* thus spoke only of future, unaccrued benefits under a

*vested* pension plan, and, as a result, its reasoning has no bearing on whether the defendant in the present case was legally obligated in May, 2001, to disclose his unvested pension benefit in his financial affidavits.[11]

C

The majority further claims that, although this court's holding in *Bender* that an unvested pension benefit is distributable marital property was not retroactive to May, 2001, the trial court in the present case "should have acknowledged that, in early to mid-2001, around the time the parties were engaged in settlement negotiations, the proper treatment of unvested pension benefits in dissolution actions was an open question in Connecticut"; (emphasis omitted); and that "there were significant indications that it would be decided as it was" in *Bender*. I disagree.

There are several problems with this reasoning. First, the possibility in May, 2001, that this court might soon determine in *Bender* that unvested pension benefits constituted distributable marital property is irrelevant because the parties were required to act on the basis of the law that existed on the date of dissolution, which, as the majority concedes, did not yet recognize that unvested pension benefits constituted property.

Second, to the extent the majority views "significant indications" as consisting of judicial decisions that broadened the interpretation of the relevant statutes and required the disclosure of other types of benefits, including vested pension benefits; *Krafick* v. *Krafick*, supra, 234 Conn. 798; personal injury awards; *Lopiano* v. *Lopiano*, supra, 247 Conn. 371; and unvested stock options; *Bornemann* v. *Bornemann*, supra, 245 Conn. 518; the fact that this court had been asked repeatedly to decide whether the parties to a dissolution proceeding had a legal obligation to disclose such benefits attests to the ambiguity of the applicable law at that time and the necessity for its continued interpretation to determine the scope of the disclosure requirement. Moreover, this court had concluded in several previous cases that the disputed resource or benefit did not constitute distributable marital property. See *Simmons* v. *Simmons*, supra, 244 Conn. 178 (medical degree); *Rubin* v. *Rubin*, supra, 204 Conn. 232 (interest in revocable inter vivos trust); *Krause* v. *Krause*, supra, 174 Conn. 364–65 (potential inheritance). Indeed, of the six cases decided by this court prior to May, 2001, in which the parties disagreed as to whether a benefit or resource was distributable marital property, the court determined in only three cases that the benefit or resource constituted property. *Lopiano* v. *Lopiano*, supra, 247 Conn. 371 (personal injury awards); *Bornemann* v. *Bornemann*, supra, 518 (unvested stock options); *Krafick* v. *Krafick*, supra, 798 (vested pension benefits). Thus, the "growing trend" to which the majority refers did not necessarily point to a future decision by this

court that a party's unvested pension benefit constituted property. Finally, insofar as the majority views the decisions of other jurisdictions that required the disclosure of unvested pension benefits in 2001 as providing a significant indication regarding this court's future decision in *Bender*, it only highlights the majority's recognition that unvested pension benefits were not considered property subject to disclosure in this jurisdiction during the parties' predissolution negotiations.

In sum, neither the defendant nor the trial court could have anticipated this court's decision in *Bender* because there was no Connecticut case law in May, 2001, suggesting that an unvested pension benefit constituted distributable marital property. No decision of this court or the Appellate Court, including *Thompson*, stated even in dictum that a trial court should consider an unvested pension benefit as a property interest in crafting its financial orders. The only references to unvested pension benefits in cases decided before May, 2001, appeared in two footnotes in *Krafick*, one of which incorrectly construed *Thompson*; see *Krafick* v. *Krafick*, supra, 234 Conn. 794–95 n.20, 798–99 n.23; a footnote in *Rosato* v. *Rosato*, 255 Conn. 412, 422 n.16, 766 A.2d 429 (2001); and a passing comment in *Smith* v. *Smith*, 249 Conn. 265, 274, 752 A.2d 1023 (1999), with *Rosato* recognizing only months before the separation agreement in the present case was drafted that the status of unvested pension benefits remained unresolved in Connecticut.[12]

Insofar as the majority suggests that the defendant and the trial court should have anticipated the result in *Bender* because of the Appellate Court's earlier decision in *Bender* v. *Bender*, 60 Conn. App. 252, 758 A.2d 890 (2000), aff'd, 258 Conn. 733, 785 A.2d 197 (2001), the Appellate Court did not address whether unvested pension benefits constitute property, the issue was not certified to this court on appeal, and this court, which ultimately decided to address the issue, had not yet published its decision in May, 2001. Moreover, *Bender* involved a different factual situation than that in the present case because the vesting requirement in *Bender* was twenty-five years of service and the defendant had been employed for approximately nineteen years at the time of the parties' divorce. Id., 253. Finally, this court never has characterized its decision in *Bender* as a mere "incremental [step]" in Connecticut's jurisprudential development that might have been anticipated. Footnote 29 of the majority opinion. Rather, this court stated in *Bender* that "the issue of whether unvested pension benefits are property subject to equitable distribution under § 46b-81 [was] one of *first impression* for this court . . . ." (Emphasis added.) *Bender* v. *Bender*, supra, 258 Conn. 743. Although there is language in *Bender* referring to a "common theme" running through our prior case law; id., 748; the theme to which *Bender*

referred consisted of the type of analysis employed, not to a series of similar holdings that would have predicted the outcome of this court's decision in *Bender*.[13] Thus, although the court in prior cases had considered certain common factors in determining whether the interest in question constituted marital property, it was not possible to predict how the court would apply those factors in a future case to the unresolved question of whether unvested pension benefits constitute distributable marital property.

The court in *Bender* also recognized that, despite the existence of a common theme, our prior case law could be interpreted in different ways, depending on the type of potential property interests at issue. See id., 753. The court stated: "Where [the majority] and the dissent [in *Bender*] part company is over the appropriate reading of our prior jurisprudence. We acknowledge . . . that *in some cases* we have determined that certain interests constituted property where there were enforceable contract rights therein, *while in others* we have determined that certain interests were too speculative to constitute property where there were no such rights. We do not read those cases, however, as the dissent does, to mark out a hard and fast line requiring such rights as the sine qua non of 'property' under § 46b-81." (Emphasis added.) Id. The court ultimately concluded: "*We believe that any uncertainty regarding vesting is more appropriately handled in the valuation and distribution stages, rather than in the classification stage.*" (Emphasis added.) Id., 749–50. Moreover, this was not a conclusion that necessarily could have been anticipated because, although it did not entirely eliminate consideration of whether an interest constitutes distributable property, it deemphasized the court's prior focus on that question and allowed consideration of the problem of uncertainty in the context of valuation and distribution.[14]

The court similarly acknowledged in a subsequent decision that, although its holding in *Bender* concerning unvested pension benefits represented a natural progression and expansion of the law, it also broke new ground. See *Mickey* v. *Mickey*, 292 Conn. 597, 625, 974 A.2d 641 (2009). In *Mickey*, we explained: "Our decision in *Bender* . . . updated [the] *traditional, fairly rigid dichotomy by establishing a more nuanced approach* to defining property interests under § 46b-81. In *Bender*, this court built [on the] foundation of our prior cases in concluding that the unvested pension of the defendant in that case was property subject to equitable distribution. . . . Consistent with our time-honored approach, we reiterated that presently enforceable rights, based on either property or contract principles, are sufficient to cause property to be divisible. *Where Bender broke new ground* was in its recognition that such rights are not the sine qua non of property under § 46b-81. . . . *In building on our prior cases, we*

*expanded our notion of property under § 46b-81, rec-
ognizing that there is a spectrum of interests that do
not fit comfortably into our traditional scheme and yet
should be available in equity for courts to distribute."*
(Citations omitted; emphasis altered; internal quotation
marks omitted.) Id. The majority quotes selectively from
this passage to emphasize the portion that refers to the
evolution and general continuity of Connecticut law in
the area of marital property rights rather than the por-
tion referring to the fact that *Bender* had recognized
a new category of property interests that "do not fit
comfortably into our traditional scheme . . . ." Id.; see
also *Czarzasty* v. *Czarzasty*, 101 Conn. App. 583, 594,
922 A.2d 272 ("[T]he court [in *Bender*] seems to have
*recast* the analysis used to determine whether an inter-
est or benefit is property under § 46b-81 to a more
probabilistic assessment untethered to the existence of
a presently existing enforceable right. Consequently,
since *Bender*, whether a party has a presently existing
enforceable right to the present or future receipt of the
asset appears no longer to be determinative. Instead,
the determination of whether a claimed asset is subject
to distribution pursuant to § 46b-81 appears to depend
on the degree of certainty revealed by the evidence that
the litigant will eventually receive the asset. In sum, in
accordance with the dictates of *Bender*, in confronting
property claims under § 46b-81, trial courts must make
an assessment on a case-by-case basis of the likelihood
of the person's receiving the asset claimed by his or
her spouse. If the likelihood is not too speculative, then
it is property subject to valuation and distribution."
[Emphasis added.]), cert. denied, 284 Conn. 902, 931
A.2d 262 (2007). Thus, when the majority opines that
the court's decision in *Bender* was predictable, or was
an incremental step that should have been anticipated
and reflected in the trial court's decision in the present
case, it goes too far, and its conclusion is inconsistent
with the conclusion in *Mickey* that *Bender* "expanded
our notion of property under § 46b-81" in a way that
could not have been foreseen by creating an entirely
new category of inchoate interests available for consid-
eration and possible distribution by Connecticut's trial
courts. *Mickey* v. *Mickey*, supra, 625. More importantly,
the majority simply does not explain why the parties
were required to predict what the future law would be
and how this court would apply it in their particular
case.

D

The majority finally relies on §§ 46b-66, 46b-81, and
46b-82 in concluding that, "even when an item is deter-
mined to be nondistributable, its existence nevertheless
is a relevant consideration for a court adjudicating a
dissolution action when it assesses the fairness of a
settlement, distributes other property or fashions other
financial orders." I agree with the majority that a party's
disclosure of the opportunity to acquire future capital

assets and income under § 46b-81, which would have included the defendant's unvested pension benefit in 2001, generally is required so that the trial court can perform its statutory duty under § 46b-66 of determining whether a separation agreement is "fair and equitable under all the circumstances." General Statutes (Rev. to 2001) § 46b-66. There are several difficulties, however, with applying this principle to the facts of the present case.

First, the trial court's statutory duty under § 46b-66 was not the legal theory on which the plaintiff's motion to open was based. The two grounds on which her motion was based were, first, that the defendant committed fraud by failing to disclose a benefit that was distributable marital property, thus causing her to rely to her detriment on a false representation of his assets and, second, that the defendant's alleged nondisclosure of the benefit was in violation of paragraph 13.11 of the parties' separation agreement. As previously discussed, the reason why the plaintiff relied on these grounds was because they enabled her to ask for relief in the form of the full value of the benefit, a lessened burden of proof, and attorney's fees and costs without reopening the entire judgment, which would not have been possible if she had based her motion on the ground that the trial court was unable to perform its statutory duty. The plaintiff thus vehemently objected to the trial court's determination in its first memorandum of decision that the defendant's unvested pension benefit was not a marital asset subject to distribution.

As evidence of her frustration, the plaintiff filed the very next day a motion for reargument, reconsideration and/or rehearing (motion for reconsideration) of the trial court's preliminary decision on the property issue. In her motion, she argued in relevant part that the trial court, in concluding that the unvested pension benefit was not marital property, had "developed a *new rule* that there was an obligation to disclose on financial affidavits and/or during discovery, even 'putative assets' such as the [unvested pension benefit] . . . and that the defendant's failure to disclose that 'putative asset' . . . prevented the court from performing its judicial function under § 46b-66 . . . thus exposing the judgment to being reopened if the nondisclosure was intentional and it would have affected the outcome of the case." (Emphasis added.) The plaintiff added that the court was in effect stating that the nondisclosure of a putative asset such as the defendant's unvested pension benefit "constituted a fraud upon the court, and the opposing party," and that the court's decision was improper because it represented "a departure from prior judicial precedent of the Connecticut Supreme Court interpreting § 46b-81 . . . ." These arguments were clearly motivated by the plaintiff's belief that the only way she could obtain 100 percent of the defendant's unvested pension benefit was to claim that the

benefit constituted property and that the defendant's alleged nondisclosure constituted both fraud and a violation of paragraph 13.11 of the parties' separation agreement, which, as previously noted, provides that the *full value* of a property interest that has been intentionally misrepresented or concealed would be transferred to the nonconcealing party. In addition, because the plaintiff strongly disagreed, during the hearing on the motion for reconsideration, that the trial court should consider the issue of its statutory duty under § 46b-66, the court's ultimate conclusion that a decision on the fairness of the separation agreement would not have been affected by nondisclosure of the defendant's unvested pension benefit left her with no basis for an appeal on statutory grounds. In other words, the trial court's conclusion that disclosure of the benefit would not have affected its statutory duty was consistent with the plaintiff's claim in her motion for reconsideration that this was an inappropriate ground on which to justify the hearing on that motion. The plaintiff was therefore not aggrieved by the trial court's decision on the issue of its statutory duty and cannot use it as a basis for an appeal. See, e.g., *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 95 n.2, 84 A.3d 828 (2014) (aggrievement is essential prerequisite to appellate jurisdiction).

In addition to the fact that the trial court raised the issue of its statutory duty under § 46b-66 sua sponte and that the plaintiff is not aggrieved by the court's decision on that issue, the majority's conclusion that the judgment should be opened is undermined by the court's factual finding that the defendant disclosed the benefit to the plaintiff. See part III of this opinion. Accordingly, in light of the trial court's finding and the apparent lack of any contrary authority, the defendant had no greater obligation than the plaintiff to disclose the benefit to the court.

I finally note the well established principle that a reviewing court may reframe a question raised on appeal to more accurately reflect the issue presented. See, e.g., *State* v. *Thompson*, 307 Conn. 567, 570 n.3, 57 A.3d 323 (2012). In the present case, however, the trial court and the majority have *changed* the issue presented in the plaintiff's motion to open and have disregarded the plaintiff's theory of the case. Furthermore, the fraud claim cannot remain in the case on the ground that the defendant's financial affidavit defrauded the court because "the concept of fraud on the court [in the marital litigation context] is properly limited to cases [in which] *both* parties join to conceal material information from the trial court." (Emphasis added.) *Billington* v. *Billington*, supra, 220 Conn. 222. I therefore disagree with the majority that the trial court should have granted the plaintiff's motion to open the judgment under the principles set forth in *Billington, Thompson, Bender*, or the relevant statutes pertaining to the trial court's financial orders.

## III

I next address the majority's conclusions regarding the fraud issue.[15] In addition to the fact that the second hearing on the motion to open was unnecessary following the trial court's determination in the first hearing that the defendant's unvested pension benefit did not constitute property, a continued hearing was improper because all of the testimony and evidence offered at the second hearing pertained to whether the defendant had disclosed the benefit to the plaintiff, rather than to whether he had disclosed the benefit to the court so that it could perform its statutory duties under § 46b-66. The majority nonetheless fails to acknowledge this disconnect between the trial court's conclusion in the first hearing and the testimony and evidence in the second hearing, which would have been relevant only if the court had determined that the benefit constituted property. The majority instead concludes that the trial court abused its discretion during the second hearing because it precluded relevant evidence regarding the value of the benefit. The majority further concludes that the trial court, in determining that the defendant disclosed the benefit to the plaintiff, relied largely on its assessment of the parties' credibility, which could have been affected by evidence of the benefit's value. The majority thus speculates that, "[i]f . . . the trial court [had] determined, on the basis of a complete evidentiary record, that the pension had considerable worth . . . that determination could have severely undermined the court's finding that the plaintiff had full knowledge of the pension, yet simply chose not to pursue any interest in it or some alternative compensation for relinquishing any such interest. Similarly, a finding of substantial value may well have changed the trial court's assessment of the defendant's account of full and frank disclosure to the plaintiff . . . ." (Citation omitted.) Text accompanying footnote 36 of the majority opinion. The majority further claims that, if the proffered testimony of the plaintiff's expert on the value of the unvested pension benefit had been admitted and credited by the court, it might have treated the benefit as distributable marital property, thus affecting the financial orders and the outcome of the case. I disagree.

"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. . . . A marital judgment based upon a stipulation may be opened if the stipulation, and thus the judgment, was obtained by fraud.

. . . A court's determinations as to the elements of fraud are findings of fact that we will not disturb unless they are clearly erroneous. . . .

"There are three limitations on a court's ability to grant relief from a dissolution judgment secured by fraud: (1) there must have been no laches or unreasonable delay by the injured party after the fraud was discovered; (2) there must be clear proof of the fraud; and (3) there [must be] a substantial likelihood that the result of the new trial will be different." (Internal quotation marks omitted.) *Weinstein* v. *Weinstein*, supra, 275 Conn. 685.

The following additional facts are relevant to a resolution of this claim. At the conclusion of its memorandum of decision on the property issue, the trial court ordered the parties to attend a status conference so that the remaining issues could be explored and a new date could be set for a hearing to determine whether the defendant's alleged failure to disclose the unvested pension benefit "was fraudulent, wilful and without just cause and, if so, whether or not the outcome of the original judgment would have been materially changed had the disclosures been made."

In preparation for the hearing, the defendant notified the court in a disclosure statement dated October 15, 2008, that he would call Mark S. Campbell to testify as an expert witness regarding the present value of the unvested pension benefit on the date of dissolution. On November 21, 2008, the plaintiff notified the court in two disclosure statements that she also would call Campbell, in addition to her own expert witness, William Miller, to testify regarding the present value of the benefit. The plaintiff's disclosure statement pertaining to Campbell indicated that she agreed with his conclusion that the defendant had an interest in an unvested pension benefit for which a present value could be determined but that she rejected and disputed the discount rate Campbell had applied to calculate this value, which he had determined was at least $17,000 on the date of dissolution. More specifically, Campbell's present value calculations assumed a discount rate equal to the twenty year treasury bond rate as of the valuation date, which was 6.04 percent per annum, plus a "[s]pecific qualitative risk" discount factor of 15 percent per annum, for a total discount rate of 21.04 percent. The 15 percent discount rate was based on several factors Campbell determined could have a potentially negative effect on the present value calculation, including (1) the unfunded nature of the pension plan,[16] (2) the defendant's unvested interest in the plan at the time of dissolution,[17] (3) the contingent nature of the plan, which depended on the defendant's company continuing as a going concern and maintaining its ability to fund the plan from its current earnings, and (4) the ability of the company to discontinue or otherwise alter the plan at

any time. In her disclosure statement pertaining to Miller, the plaintiff indicated he would testify that the present value of the benefit on the date of the dissolution was $1,079,451 under the "proper" discount rate, assuming the defendant retired at the age of fifty-five. Although Miller was expected to testify that Campbell's use of the 15 percent discount rate was "not appropriate," and that he did not consider the risks and uncertainties on which this discount rate was based in his own present value calculation, Miller acknowledged many of the same uncertainties identified by Campbell, as well as several others. For example, Miller noted in his report, which was attached as an exhibit to the disclosure statement, that the pension plan was unfunded and would be directly affected by the ongoing financial health of the company, the defendant was not eligible for any benefit payment on the date of dissolution, the defendant would forfeit the benefit if he terminated his employment with the company before the early retirement age of fifty, and the present value of the benefit could vary significantly depending on the age at which the defendant retired. Miller nonetheless indicated that, in calculating the present value of the benefit, he did not take these uncertainties into account but "based [his calculation on] the terms and conditions of the plan . . . as set forth in the expanded retirement benefit projection reports available to [the company] . . . and the defendant's dates of service, years of service as a partner and his earnings." Miller also assumed that the defendant would retire at the age of fifty-five, thus allowing him to conclude that the present value of the benefit was $1,079,451, which was 56 percent higher than the benefit's present value of $693,663 if the defendant retired at the age of sixty, the normal retirement age for company employees and the age used in the company's own formula for calculating the value of employee benefits under its pension plan.[18]

On November 25, 2008, the trial court considered whether to admit the proposed testimony and concluded that any evidence regarding value was "just not relevant." The court reiterated, upon further reflection, that "the proffer of any evidence with regard to valuation, at this stage, would . . . not be material, [would not] be relevant . . . ." The following day, when the parties raised the matter again, the trial court repeated that it did not believe the valuation testimony was relevant or material to the issue of fraud in the second hearing. See footnote 21 of this opinion (further explaining procedural history of proceedings on admission of expert testimony).

After the hearing, the trial court issued its second memorandum of decision on the plaintiff's motion to reopen. The court concluded that the plaintiff had not clearly proven fraud because either she or her attorney had been apprised of the unvested pension benefit both before and during the dissolution proceedings. In refer-

ring to the factual predicate for its conclusion, the trial court explained as follows: "During [the second hearing], the court heard from the [defendant] regarding his knowledge of the salient aspects of his [company], including income and retirement. He testified that he and [the plaintiff], a [certified public accountant] and former [company] employee from 1984 through 1991, frequently discussed these subjects. In particular, he told the court that, although the general terms of the [unvested pension benefit] were known to the [company] partners, they were not committed to writing until 2002. In response to partner inquiries, a template allowing the employee to input data, including salary and longevity, was made available to the employees on their work computers on or about April, 2000, which allowed them to project an estimate of the future benefit. The [defendant] said that he did not access his computer at that time for that purpose.

"Later, during the [dissolution] proceedings, he discussed this potential benefit with his attorney, and they made an affirmative decision not to list the [unvested pension benefit] on the financial affidavit, as it was not funded, vested, or accrued at that time. Still later, he testified that the [unvested pension benefit], along with other topics, including the potential future sale of [the consulting arm of the company], came up during a settlement conference at the office of the [plaintiff's] attorney, Anthony Piazza, at which was also present the [plaintiff's] expert, Mark Harrison, who had been hired to value the [defendant's] benefits. The [defendant] has consistently maintained this position throughout the proceedings, and the court concluded that this position was accepted by the [plaintiff] and those representing her. The [defendant's] counsel, Christopher Burdett, confirmed his client's account. The [plaintiff's] attorney did not deny that the meeting took place but denied that the subject of the [unvested pension benefit] came up at that time. . . . Harrison did not deny that he was present at the meeting; however, [he] told the court that, at that time, he was aware that [the company] had [an unvested pension benefit], but he could not say for sure . . . now eight years later . . . what the source of his knowledge was, since he had also been hired as an expert by another [company employee's] spouse at the same time. . . . [T]he [plaintiff] testified consistently that she had no knowledge of the [unvested pension benefit] up to that point. The [defendant] and his counsel continued to take the position that the [unvested pension benefit] was not an asset, and, therefore, they elected not to . . . note it [in] the [defendant's] financial affidavit. . . .

"The next disputed incident took place during final negotiations at the courthouse on May 25, 2001, the day set for trial. Present were the [plaintiff], Attorney Piazza, his associate, Laura Simmons, and . . . Harrison. The [defendant] was there along with Attorney Burdett, as

well as a coworker, [Anthony] Artabane. The parties and witnesses all agree that the negotiations took place all day at the courthouse, culminating in an agreement and a hearing before [the court] late in the afternoon, at which time the court approved the agreement and dissolved the marriage. It is also undisputed that some clauses were reworked and typed at Attorney Piazza's office that same day, and that some changes were simply inserted by hand and initialed. From that point on, the stories diverge. The [defendant] testified that the subject of the [unvested pension benefit] came up during the day, in the absence of his attorney, during a discussion between himself, [the plaintiff], and her counsel, Attorneys Burdett and Simmons being at [Attorney] Piazza's office to have some changes to the agreement typed. Again, the [plaintiff] and her attorney dispute this claim. However, it is supported by . . . Artabane, who was present in court that day and was within earshot of that discussion. [Artabane] testified that he joined that discussion to corroborate the position taken by the [defendant] regarding the [unvested pension benefit]. One specific change to the agreement, which the court found significant, was the insertion of the word 'vested' in . . . paragraph 13.11 [of the separation agreement], which . . . called for penalties in the event of a party's failure to disclose a vested asset.

"On balance, the court believes that the [defendant's] version of events is more credible. The court found both parties to be intelligent and articulate, and the fact that both are [certified public accountants] and familiar with numbers and complex financial matters lends further credence to the [defendant's] argument. Furthermore, the court does not believe that the subject of the [unvested pension benefit] did not come up between [the defendant] and [the plaintiff] at any time during their marriage, in particular, within the context of the salient aspects of the [defendant's] partnership, including retirement benefits, or in the lengthy merger negotiations with [another company], and, in particular, regarding the preservation of existing and potential partner benefits, like the [unvested pension benefit]. Certainly, the aspirational expectations of both spouses were shared from time to time during the marriage, if only in the form of pillow talk. In point of fact, the [plaintiff] herself told the court that, during their marriage, she and [the defendant] discussed four broad, work-related subjects, to wit: (1) office politics; (2) benefits; (3) finances and compensation; and (4) partnership. The court believes that the testimony and evidence supports a finding that the [plaintiff] knew about the [unvested pension benefit] at the time of the dissolution of marriage in 2001 and that she now wishes to change the bargain she reached with the advice of counsel and her expert." (Emphasis omitted; internal quotation marks omitted.)

Thereafter, the trial court determined that the

unvested pension benefit did not constitute property because of the reasons set forth in its earlier memorandum of decision. The court also explained that, in considering whether the separation agreement was fair and equitable within the meaning of § 46b-66, "a court bases its consideration of fairness upon the financial affidavits of the parties; that the better practice would be to call the court's attention to an item of potential financial significance by way of a footnote on said affidavit; that, under all the facts and circumstances, the [defendant's] failure to list [the] same on his financial affidavit was not fraudulent, and, in any event, would not likely have changed the outcome of the court's finding of fairness." The court further concluded "[t]hat the testimony and evidence supports a finding that, while the [defendant] did not disclose the existence of the [unvested pension benefit] on his financial affidavit, at least as late as the final negotiations that took place at the courthouse on May 25, 2001, the [plaintiff] and her counsel knew about the [unvested pension benefit], that the [defendant] did disclose [the] same in the context of negotiations leading up to the execution of a written [separation] agreement, as evidenced in part by the written amendments to said agreement, and that fact is amply supported by the testimony of the [defendant] and his witnesses."

On the basis of these factual findings, the trial court concluded that "[t]he [plaintiff] has failed to meet her burden in that there was no clear proof of fraud; to the contrary, the court found sufficient evidence to support a finding that the existence of the [unvested pension benefit] was disclosed to the [plaintiff] and her counsel during the settlement negotiations and prior to the entry of the decree." The court further concluded that, although "[i]n a matrimonial action, financial affidavits play an important role, and there is a need for full and fair disclosure . . . [u]nder all the facts and circumstances, there was insufficient evidence presented to the court to demonstrate that, in the event of a new trial, there was a likelihood of a different result." (Citation omitted.) I agree with the trial court's conclusions because they are based on factual findings, supported by documentary and testimonial evidence from the defendant and several other witnesses, that the defendant disclosed the unvested pension benefit to the plaintiff during the settlement negotiations.

Nevertheless, instead of addressing the trial court's findings and conclusions directly to determine whether they were clearly erroneous;[19] see, e.g., *Nyenhuis* v. *Metropolitan District Commission*, 300 Conn. 708, 729, 22 A.3d 1181 (2011) (trial court's findings of fact subject to clearly erroneous standard of review); the majority attempts to avoid this requirement by taking a more circuitous path, claiming that the trial court abused its discretion by improperly precluding the evidence proffered by the plaintiff through her expert witness concerning the value of the defendant's unvested pen-

sion benefit. It is therefore necessary to consider the law on evidence.

"It is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and [the reviewing court] will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . [Thus, the court's] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . .

"The law defining the relevance of evidence is also well settled. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *Jewett* v. *Jewett*, 265 Conn. 669, 679–80, 830 A.2d 193 (2003).

The majority claims that the trial court decided the issue of fraud "largely on the basis of its assessment of the parties' credibility," and that the expert testimony concerning the value of the unvested pension benefit was relevant to the trial court's assessments of the defendant's credibility and to show that the outcome of a new trial probably would have been different if the testimony had been allowed.[20] I disagree.

The majority considers and decides this issue because it was raised by the plaintiff as a minor argument in her brief to this court. The record makes clear, however, that the plaintiff did not offer the expert testimony of Campbell or Miller for the purpose of impeaching the defendant's testimony regarding his disclosure of the benefit to the plaintiff but, rather, to provide substantive evidence of the benefit's value in support of her motion for reconsideration of the trial court's prior ruling that the benefit constituted property. The issue of the defendant's credibility was never raised in the disclosure statements, which were filed several days before the trial court's hearing on the matter, nor was it raised during the hearing itself. After the trial court expressly concluded on two successive days that expert testimony on the value of the pension benefit was "not relevant" or material to the issue of fraud

because the benefit did not constitute property, neither party made any further argument as to why the testimony should be heard. If the plaintiff had intended to offer the testimony for the purpose of impeaching the defendant's credibility, she could have made that argument to the court. Because she failed to do so, the court was unable to consider it.[21] It is well established that this court will not consider a claim not raised at trial. See, e.g., *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 82, 848 A.2d 395 (2004). "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling . . . is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Johnson*, 289 Conn. 437, 460–61, 958 A.2d 713 (2008); see also *Council* v. *Commissioner of Correction*, 286 Conn. 477, 498, 944 A.2d 340 (2008) ("[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." [Internal quotation marks omitted.]). "Thus, because the sina qua non of preservation is fair notice to the trial court; see, e.g., *State* v. *Ross*, 269 Conn. 213, 335–36, 849 A.2d 648 (2004) (the essence of the preservation requirement is that *fair notice* be given to the trial court of the party's view of the governing law . . .); the determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Emphasis in original; internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753–54, 66 A.3d 869 (2013). Accordingly, the plaintiff improperly raised this unpreserved claim on appeal, and the majority has improperly decided it.[22]

Nevertheless, even if the expert testimony was relevant to the issue of the defendant's credibility, the trial

court's decision to exclude it was not harmful error. "The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 366, 926 A.2d 1024 (2007).

There is no support for the majority's conclusion that the expert testimony might have affected the outcome of the hearing because the trial court did not decide whether the defendant committed fraud "largely on the basis of its assessment of the parties' credibility," and, more particularly, the defendant's credibility. The defendant's testimony that he had disclosed information to the plaintiff regarding the unvested pension benefit was only one of many factors, including the *plaintiff's* testimony, that the trial court considered in concluding that the plaintiff or her attorney had knowledge of the benefit. Among these other factors were (1) testimony by the defendant's attorney that the benefit was mentioned during a predissolution settlement conference at the office of the plaintiff's attorney, (2) testimony by one of the defendant's coworkers that he overheard a conversation between the defendant, the plaintiff, and the plaintiff's attorney during the final settlement negotiations at the courthouse on the date of dissolution, at which time the unvested pension benefit was mentioned and that he joined in the discussion to confirm the defendant's position with respect to the benefit, (3) insertion of the word "vested" by way of a handwritten amendment to paragraph 13.11 of the parties' separation agreement, which pertained to the penalties that would be imposed in the event that a party failed to disclose a property interest, thus indicating an explicit understanding by both the parties and their attorneys that unvested pension benefits were not covered by the provision, (4) the formidable penalties set forth in paragraph 13.11 of the separation agreement for a party's failure to disclose a vested benefit, (5) the plaintiff's testimony that she was a certified public accountant and therefore familiar with numbers and complex financial matters, and (6) the plaintiff's testimony that, during their marriage, she discussed, inter alia, benefits, finances, compensation and partnership matters with the defendant. Moreover, given that the defendant would have lost the entire value of the benefit if he intentionally failed to disclose it to the plaintiff, he had no incentive to hide it and every reason to disclose it, a fact that was not likely to have eluded the trial court. Accordingly, because a finding of fraud requires "clear proof" of fraud, the defendant's testimony was not dispositive but only one of many factors that the court considered in reaching its conclusion that the plaintiff had failed to meet her burden of proving that the defendant committed fraud.

For the foregoing reasons, I respectfully dissent from

parts I and II of the majority opinion.

[1] The asset was known as the "PricewaterhouseCoopers Partners Retirement Plan."

[2] The plaintiff filed her original motion to open on May 11, 2005. She subsequently filed her request for permission to amend the motion and the proposed amended motion on September 15, 2005. On November 14, 2008, she filed a third and final amended motion in which she added allegations relating to a small, but also allegedly undisclosed, retirement plan that had not been referenced in her previous motions.

[3] The term "resource" is used throughout this opinion to describe all financial interests potentially subject to equitable distribution because that is the term this court used in *Krafick* v. *Krafick*, 234 Conn. 783, 792, 663 A.2d 365 (1995), in discussing whether a vested benefit should be deemed property subject to distribution under § 46b-81. A resource may or may not be an asset or property, but only an asset or property is subject to equitable distribution under § 46b-81.

[4] In her final amended motion to open, the plaintiff modified the language she used in her prior amended motion from claiming a right to "100 percent of the asset" to claiming a right to "one half or 100 percent of the concealed asset" because another provision in paragraph 13.11 of the parties' separation agreement provided for an equal division of the concealed asset if the nondisclosure was not fraudulent.

[5] The trial court acknowledged nine months later during a subsequent hearing on the plaintiff's amended motion to open that it was aware of, and had followed, the "*Krafick* model" in its analysis of the property issue. The court specifically noted that, because this court had not yet decided *Bender* v. *Bender*, 258 Conn. 733, 785 A.2d 197 (2001), at the time of dissolution, it had followed "the *Krafick* model . . . the three part model" in ruling on the motion, which required an initial determination of whether the unvested pension constituted distributable marital property.

[6] The issue of the trial court's ability to perform its statutory duty was not raised by the plaintiff but, rather, was raised by the court sua sponte.

[7] General Statutes (Rev. to 2001) § 46b-66 provides in relevant part: "In any case under this chapter where the parties have submitted to the court an agreement . . . concerning alimony or the disposition of property, the court shall inquire into the financial resources and actual needs of the spouses . . . in order to determine whether the agreement of the spouses is fair and equitable under all the circumstances. . . ."

Hereinafter, all references to § 46b-66 are to the 2001 revision.

[8] General Statutes (Rev. to 2001) § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other. . . .

\* \* \*

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

Hereinafter, all references to § 46b-81 are to the 2001 revision.

[9] General Statutes (Rev. to 2001) § 46b-82 provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other . . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81 . . . ."

Hereinafter, all references to § 46b-82 are to the 2001 revision.

[10] The underlying issue in *Billington* was "whether a party to a marital dissolution judgment must establish, in order [to] subsequently . . . open the judgment based upon a claim of fraud, that she was diligent during the original action in attempting to discover the fraud." *Billington* v. *Billington*, supra, 220 Conn. 214. The alleged fraud in *Billington* was the defendant's failure to disclose information that would have resulted in a significantly

higher valuation of a piece of real property that he had listed on his financial affidavit. Id., 214–15. The quoted passage was thus intended to emphasize the parties' obligation to provide *accurate* information in their financial affidavits as a context for its subsequent discussion of the diligence issue. See id., 219–20. At the time *Billington* was decided, this court had not yet determined whether unvested property interests were too speculative to be considered assets subject to distribution.

[11] The majority's conclusion that "*Thompson* still stands for the proposition that benefits that are not distributable property, for whatever reason, may be taken into account by a court fashioning financial orders in a dissolution proceeding"; footnote 20 of the majority opinion; is incorrect, and, therefore, *Thompson* provides no support for the majority's assertion that there were unmistakable signs before the dissolution judgment in the present case that this court would determine in *Bender* that unvested pension benefits constituted property.

[12] In the first *Krafick* footnote, the court evaluated the effect of *Thompson* on the issue of whether vested pension benefits constituted distributable marital property and incorrectly observed that *Thompson* had "addressed nonvested pension benefits and concluded only that such interests were not too speculative to be taken into account in some fashion by the trial court in crafting its financial orders in a dissolution action." *Krafick* v. *Krafick*, supra, 234 Conn. 794–95 n.20. In a second footnote, the court further noted that its conclusion that vested pension benefits constituted property was consistent with the conclusions of courts in other jurisdictions that nonvested pensions constitute property. Id., 798–99 n.23. Only two months before dissolution of the parties' marriage, however, this court expressly recognized that the court in *Krafick* had "left open the question of whether nonvested pensions are distributable [marital assets]"; (emphasis omitted) *Rosato* v. *Rosato*, supra, 255 Conn. 422 n.16; which was consistent with an even more explicit recognition by this court only one year earlier that "the marital estate divisible pursuant to § 46b-81 refers to interests already acquired, not to expected or unvested interests . . . ." *Smith* v. *Smith*, supra, 249 Conn. 274. Thus, insofar as the majority suggests that the case law existing around the time of the parties' divorce was "trending toward a broader conception of what constituted distributable [marital] property"; footnote 24 of the majority opinion; see *Lopiano* v. *Lopiano*, supra, 247 Conn. 371; *Bornemann* v. *Bornemann*, supra, 245 Conn. 518; *Krafick* v. *Krafick*, supra, 798; this court's dicta in *Rosato* and *Smith*, which were published only months before the dissolution judgment in the present case, indicated the court's intent to place limits on the concept of distributable marital property and its recognition that the question of whether unvested pension benefits constituted property had not been decided.

[13] After discussing several recent decisions of this court, the court in *Bender* stated: "These cases reflect a common theme, namely, that in determining whether a certain interest is property subject to equitable distribution under § 46b-81, we look to whether a party's expectation of a benefit attached to that interest was too speculative to constitute divisible marital property." *Bender* v. *Bender*, supra, 258 Conn. 748.

[14] I agree with the majority that the trial court in the present case improperly relied in part on my dissent in *Bender*; see *Bender* v. *Bender*, supra, 258 Conn. 764 (*Zarella, J.*, dissenting); as a basis for its decision. The majority correctly observes that my dissent was "not an authoritative ruling to be applied by a lower court." Footnote 29 of the majority opinion. Consequently, to the extent that the trial court relied on my dissent in *Bender*, I reject that portion of its analysis.

[15] I readily agree that disclosure of an unvested pension benefit on a financial affidavit is required after *Bender* because we determined in that case that unvested pension benefits constitute property subject to equitable distribution.

[16] Thus, the payment of pension benefits was subject to the general revenues of the defendant's company.

[17] As of the date of dissolution, the defendant was not eligible for the pension benefit because he was only forty-five years old, and an early retirement benefit was not available until a partner was at least fifty years old. If the defendant had terminated his employment prior to the early retirement age of fifty, he would have forfeited the benefit.

[18] To the extent the majority refers to a present value of $3,839,117 in its statement of facts and elsewhere in its opinion; see, e.g., footnote 32 of the majority opinion; it is not relevant to the current analysis, and neither the plaintiff nor the defendant suggests that this was the present value of the pension. The $3.8 million valuation was contained in the company's standard

projection report, was derived from certain default assumptions that were not necessarily appropriate in the defendant's case, and, as the majority acknowledges, "[t]he projection report did not take into account the contingencies to which the defendant's ultimate receipt of the pension was subject . . . nor did it specify which portion of the present value was attributable to services that were yet to be rendered, postdissolution." Id.

[19] The majority states that it does not consider whether the trial court's factual finding that the pension was disclosed was clearly erroneous because "the plaintiff has not made that argument . . . ." Footnote 38 of the majority opinion. The majority, however, fails to understand the rules of practice that legitimize such claims. Practice Book § 67-4 (d) provides that each argument in the appellant's brief "shall include a separate, brief statement of the standard of review the appellant believes should be applied." Practice Book § 67-5 (d) similarly provides that each argument in the appellee's brief "shall include a separate, brief statement of the standard of review the appellee believes should be applied." Thus, by requiring the parties to articulate the applicable standard of review, our rules of practice open the door for disagreement and mandate a decision by the reviewing court explaining its reasons for selecting the standard of review that it ultimately applies to resolve the issue. Moreover, this has been the practice of Connecticut's reviewing courts for a very long time. See, e.g., *State* v. *Coccomo*, 302 Conn. 664, 671 and n.2, 31 A.3d 1012 (2011) (rejecting defendant's argument that standard of review should be de novo); *Perez* v. *Minore*, 147 Conn. App. 704, 709, 84 A.3d 460 (2014) (acknowledging plaintiffs' argument that standard of review should be plenary but agreeing with defendant that proper standard of review was abuse of discretion); *Brye* v. *State*, 147 Conn. App. 173, 177, 81 A.3d 1198 (2013) (acknowledging state's argument that standard of review should be abuse of discretion but agreeing with plaintiff that proper standard of review was plenary). Accordingly, given that the defendant in the present case devoted four pages of his appellate brief to disputing the plaintiff's assertion that all of her claims of error were subject to plenary review and contending that this court should review the trial court's factual findings to determine whether they were clearly erroneous, the majority must address the defendant's argument and explain why it is unpersuasive.

[20] The majority specifically claims that, "[i]f . . . the trial court [had] determined, on the basis of a complete evidentiary record, that the pension had considerable worth . . . that determination could have severely undermined the court's finding that the plaintiff had full knowledge of the pension, yet simply chose not to pursue any interest in it or some alternative compensation for relinquishing any such interest. Similarly, a finding of substantial value may well have changed the trial court's assessment of the defendant's account of full and frank disclosure to the plaintiff, namely, disclosure not only of the pension's existence, but of *all* its salient features, including its value." (Citation omitted; emphasis in original.) Text accompanying footnote 36 of the majority opinion.

[21] The majority defends its conclusion that the expert testimony should have been admitted on the ground that it was relevant to the trial court's determination of the defendant's credibility, even though neither party raised that claim, because "[t]he trial court . . . did not even wait for the plaintiff to offer the evidence, or for the defendant to object to it, before ruling, sua sponte, that no evidence of value would be admitted, although *both* parties had prepared such evidence and intended to present it. In the highly unusual circumstances of this case, [in which] the trial court imposed its own theoretical framework on the litigation, unexpectedly altered that framework midstream and, then, proactively ruled on evidentiary objections that had not been made, we decline to penalize the plaintiff for not making a textbook objection to the trial court's sua sponte ruling. Because . . . valuation evidence clearly was relevant to both the elements of fraud and the factors governing a motion to open on the basis of fraud, the trial court's ruling likely invoked confusion." (Emphasis in original.) Footnote 35 of the majority opinion. In other words, the majority concludes that it may decide whether the expert testimony was relevant on a ground that the parties never raised because the trial court allegedly prevented them from fully explaining their arguments or objections prior to its sua sponte ruling to exclude the testimony. The majority thus suggests that the plaintiff would have argued that the testimony might have affected the trial court's credibility determination if she had been given the opportunity to present it. I strongly disagree with this conclusion because it is based on mere speculation and a complete misunderstanding of the record.

The trial court's sua sponte ruling was not made before the parties explained why they wanted to offer the expert testimony, the ruling did not

proactively cut off potential evidentiary objections by either party, and it did not invoke confusion. Rather, the ruling came near the end of a series of filings and discussions over the course of several weeks, during which both parties had ample time to explain their views to the court regarding why they believed the expert testimony was necessary. Accordingly, the court's sua sponte ruling, and its three other rulings relating to the proffered testimony, were well understood and accepted by the parties.

The subject of expert testimony initially arose following the trial court's issuance of its memorandum of decision on June 10, 2008, in which it concluded that the defendant's unvested pension benefit did not constitute property subject to distribution. At a July 3, 2008 hearing intended to clarify the issues to be considered during the phase two hearing, on the issue of fraud, the court stated that it did not know if expert witnesses would be required but that, if the parties believed they were, the court would need to hear why.

The subject next was raised on October 15, 2008, when the defendant filed a notice disclosing his intention to call Campbell as an expert witness. The defendant provided the plaintiff with a copy of Campbell's report, which contained information regarding the professional accounting standards in effect at that time and an estimate of the present value of the defendant's unvested pension benefit as of the date of dissolution. On October 17, 2008, the plaintiff filed a motion to preclude Campbell's testimony on the ground that she was prejudiced because the disclosure was late, and, therefore, she would not have sufficient time to depose Campbell or retain her own expert to evaluate Campbell's report before the start of the phase two hearing. She also argued that the defendant appeared to be trying to relitigate the effect of the professional accounting standards on his obligation to disclose the pension benefit to the plaintiff, an issue the court already had decided during the phase one hearing, and that the defendant was attempting to offer evidence on another subject the court also previously had decided, namely, his legal obligation to disclose the benefit in his financial affidavits.

At a hearing on October 29, 2008, the trial court denied the motion. After counsel explained the plaintiff's reasons for seeking to preclude Campbell's testimony, the court determined that the testimony would be germane to the financial orders and that the defendant should be allowed to present it. The court also determined that Campbell should be allowed to testify regarding the applicability of the professional accounting standards to the defendant's personal life, thus potentially shedding light on his state of mind and his reasons for preparing the financial affidavits as he did.

On November 21, 2008, the plaintiff filed two notices with the court disclosing her intention to call Campbell and Miller as expert witnesses in her case. On November 24, 2008, she also filed a motion for reconsideration of the trial court's phase one ruling that the defendant's unvested pension benefit constituted property. The plaintiff argued that the fact that the defendant, through Campbell, had ascribed a present value to his accrued benefit at the time of dissolution was a significant new consideration that the court should weigh along with a reexamination of its decision that the benefit constituted property. The plaintiff's counsel reiterated in a hearing on the motion for reconsideration that, if the court had known that the benefit had value, it might have decided the property issue differently. The defendant's counsel objected, arguing that it was too late to reconsider the court's phase one decision. The defendant's counsel also noted that the court had been apprised, before its phase one ruling, of the fact that the pension benefit may have had value when the plaintiff's expert, Miller, had been allowed to testify that the benefit had an undiscounted present value of $ 3.8 million and a discounted present value of $400,000. The defendant's counsel further challenged the plaintiff's theory that ascribing a value to the benefit meant that the benefit constituted property subject to distribution.

The hearing on the motion for reconsideration continued the following day, at which time the defendant's counsel again argued that the plaintiff's request for reconsideration of the trial court's phase one ruling was improper and that, contrary to the plaintiff's claim, the fact that the benefit had value did not mean that it constituted property. The defendant's counsel thus contended that, to reconsider and open the judgment under the second prong of *Krafick*, which required the court to consider the value of the benefit following a first prong determination that the benefit constituted property, would not comply with the *Krafick* model. The plaintiff's counsel responded that there would have been no reason for the defendant to offer evidence through Campbell of the benefit's present value if it did not constitute property.

The trial court then reflected that, from its perspective, the defendant's counsel had been arguing that Campbell's testimony went to the defendant's mental state, apparently meaning Campbell's expected testimony regarding the applicability of the professional accounting standards to the defendant's personal life. Thus, to the extent the testimony was about the benefit's present value, such testimony was irrelevant. The trial court explained that, after the decision in *Bender*, this court seemed to have no problem skipping step one and going directly to step two of the *Krafick* analysis, on valuation, thus "boot-strapping" the concept of property onto the concept of valuation by concluding that "if there's value, then it must be property." The court reminded the parties, however, that it was required to apply pre-*Bender* law, and that, to be consistent with the line of pre-*Bender* authority, the valuation of a benefit was not relevant to a determination of whether it constituted property. The plaintiff's counsel responded that he still had to proffer the testimony of Miller, his expert witness, for the purpose of establishing a proper record, and the trial court stated that it understood the need to do so. After additional pondering regarding the effect of valuation on the concept of property, the court stated: "So, from your standpoint, [defense counsel], I would sua sponte rule that the proffer of any evidence with regard to valuation, at this stage, would . . . not be material, [would not] be relevant . . . ." The court added a few minutes later that it was denying the plaintiff's motion for reconsideration because it did not believe that valuation played a role with respect to the unvested pension benefit. The plaintiff's attorney made no further comments regarding that ruling.

The next day's hearing began with a statement by the plaintiff's attorney, who acknowledged the trial court's ruling the previous day but sought to make an offer of proof as to the testimony of Campbell and Miller to "protect the record . . . ." He stated that the two expert witnesses, who were present in the courtroom that day, were prepared to testify in accordance with the disclosure statements he previously had filed with the court. The defendant's counsel moved to preclude the testimony based on the offer of proof because the trial court's ruling on the motion for reconsideration the preceding day had made very clear that the court "would not consider evidence of value at this stage of the phase two hearing, and, in accordance with [the court's] previous ruling, [the defendant's counsel] would ask for a motion to preclude both witnesses, and . . . that satisfies [the plaintiff's counsel's] need to protect the record based on his offer." The trial court responded that its sua sponte ruling was intended to reverse its earlier ruling denying the plaintiff's motion to preclude Campbell's testimony on behalf of the defendant. The court explained: "I have since had time to reflect upon this and, in considering the evidence I have to date, and considering the case law as I understand it, I don't believe that valuation testimony is relevant or material to the issue we have in this particular phase. So, for that reason, I am precluding [Campbell, the defendant's] witness. I indicated that I took it upon my shoulders on [that] one. I indicated that was . . . sua sponte . . . ." The defendant's attorney then renewed his motion to preclude the testimony of the plaintiff's expert witness, Miller, based on the trial court's decision regarding the testimony of the defendant's own expert witness, Campbell. Although the trial court made no further ruling, the plaintiff's attorney indicated his acceptance of the court's decision to preclude the testimony, apparently by virtue of the court's ruling on the motion for reconsideration and its ruling on the defendant's expert witness, and asked that the disclosure offer function as the plaintiff's proffer for purposes of clarifying the record.

At no time during the six weeks that the parties and the trial court discussed the issue of expert testimony did either party argue, or even remotely suggest, that the testimony was proffered for the purpose of assisting the court in making credibility determinations. Furthermore, none of the trial court's rulings precluded the plaintiff's attorney from making that argument. Accordingly, the majority's conclusions with respect to this matter are unsupported by the record.

[22] Even if this claim had been properly preserved for impeachment purposes, Miller's proffered testimony regarding the present value of the defendant's unvested pension benefit on the date of dissolution was inadmissible. Miller failed to consider the risk factors that Campbell had used to justify a 15 percent discount rate in calculating the present value and that Miller *himself* had identified in his report as risks but did not include in his calculation. For example, Miller noted that the plan was unfunded, the benefit was unvested on the date of dissolution, the benefit would be affected by the defendant's company's financial health, and the defendant would

forfeit the benefit if he terminated his employment with the company before the age of fifty. Despite acknowledging these uncertainties, however, Miller treated the defendant's unvested pension benefit for all intents and purposes as vested, accrued, payable from a pension account with sufficient funding, and without any cap, when in fact the benefit was wholly unfunded, only partially accrued, to be paid out of future company earnings, and limited by a cap based on those earnings. Accordingly, because Miller omitted from his calculation any consideration whatsoever of the risks and uncertainties that both he and Campbell had identified, his determination regarding the benefit's present value was grossly deficient and thus inadmissible, *especially* under *Bender*. See *Bender* v. *Bender*, supra, 258 Conn. 749–50 (uncertainties and contingencies to be considered in valuation of property interests). Indeed, I find it highly ironic that Campbell conducted what amounted to a *Bender* valuation of the defendant's unvested pension plan, whereas Miller conducted a valuation analysis completely inconsistent with *Bender* because his calculation did not take into account the contingencies that he had identified. I thus disagree with the majority's claim that the trial court would have accepted Miller's calculation, would not have found the separation agreement to be fair and equitable, and would not have found the defendant's testimony to be credible if Miller had been allowed to testify that the unvested pension benefit had a present value of $1,079,451.

I add that, to the extent the majority claims that my critique of Miller's proposed testimony is unwarranted and that I am "essentially . . . finding facts"; footnote 37 of the majority opinion; it is the majority that raises the issue of the validity and relevance of Miller's testimony by declaring that, "[i]f . . . the trial court [had] determined, on the basis of a complete evidentiary record, that the pension had considerable worth . . . that determination could have severely undermined the court's finding that the plaintiff had full knowledge of the pension, yet simply chose not to pursue any interest in it or some alternative compensation for relinquishing any such interest. Similarly, a finding of substantial value may well have changed the trial court's assessment of the defendant's account of full and frank disclosure to the plaintiff, namely, disclosure not only of the pension's existence, but of *all* its salient features, including its value." (Citation omitted; emphasis in original.) Text accompanying footnote 36 of the majority opinion. Not only does this passage clearly presume the validity of Miller's calculations, but it includes a citation to a prior footnote explaining that Miller would have testified that the present value of the defendant's unvested pension benefit as of the date of dissolution was "in excess of $1 million." Footnote 34 of the majority opinion. It is therefore the majority that makes an issue of the validity and relevance of Miller's testimony, to which I merely respond.